UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
ALEC SOYBEL and GALINA KAMINKER, on Behalf of      Docket No.:  21 Civ. 01846
Themselves and Others Similarly Situated,

                              Plaintiffs,               **PROPOSED CLASS**
                                              **<u>ACTION COMPLAINT</u>**

              -against-

THE CITY OF NEW YORK, NEW YORK CITY TAXI &      **JURY TRIAL**
LIMOUSINE COMMISSION, MATTHEW W. DAUS,      **<u>DEMANDED</u>**
DAVID YASSKY, MEERA JOSHI, ALAN FROMBERG,
CHARLES FRASER, MICHAEL BLOOMBERG,
EVGENY FREIDMAN, VLADIMIR BASIN, and      **ECF CASE**
MAMED DZHANIYEV,

                          Defendants.
--------------------------------------------------------------------------X

1

# TABLE OF CONTENTS

Pages

PRELIMINARY STATEMENT ................................................................................1

NATURE OF ACTION .........................................................................................3

    A.    The Five Key Components of Defendants' Fraudulent Scheme......................3

        i.    TLC's Artificial and Grossly Inflated "Upset Price" for Medallions.................................................................................4

        ii.    The Collusive Bidding at TLC's Medallion Auctions............................4

        iii.    TLC's Manipulation of Average Monthly Sales Data for Medallion Transactions....................................................................6

        iv.    TLC's Fraudulent Concealment of the Roth Report............................7

        v.    TLC's False and Misleading Advertising Campaigns About Medallions.............................................................................10

    B.    The Driving Force Behind Defendants' Medallion Inflation Scheme: "Greed."........................................................................11

JURISDICTION AND VENUE ................................................................................13

THE PARTIES .................................................................................................13

    A.    Plaintiffs ....................................................................................14

    B.    Defendants .................................................................................14

I.    FACTUAL BACKGROUND OF THE RICO CONSPIRACY..................................16

    A.    The Origins of the Fraudulent Scheme: Bloomberg Orders TLC to Sell Over 1000 Medallions to Close the City's Budget Deficit .................................17

    B.    In Furtherance of Defendants' Scheme, TLC and The City Set Grossly Inflated "Upset Prices" to Establish an Artificial Floor for Medallion Values.......................................................................................18

C.    **TLC Turns a Blind Eye to Collusion at Several Auctions, and Then Uses These Artificially Inflated Prices to Set New, Unprecedented Values for Medallions** ........................................................................20

D.    **TLC Deliberately Ignores Concerns Raised by OMB and the Law Department, and Allows Two More Collusive Auctions to Be Held in June 2006** .................................................................................................23

E.    **TLC Facilitates the Freidman Defendants' Collusion by Changing its Rules at the 2006 Auctions** ............................................................24

F.    **Despite Recognizing that The Freidman Defendants' Bids "Appeared to Be a Scam," TLC Turns a Blind Eye to Their Collusion** ............................25

G.    **TLC also Overlooks the Freidman Defendants' Collusion at the April 2004 and October 2004 Auctions** ..........................................................27

H.    **After TLC Allows Collusion to Repeatedly Occur, Medallion Prices Soar to Unprecedented Highs** .......................................................................28

I.    **While Medallion Values Skyrocket, an Internal TLC Report Warns of the Potential Collapse of the Medallion Market, but TLC Hides the Roth Report from the Public** ..............................................................30

II.    **TLC FRAUDULENTLY CONCEALS ITS PLAN TO ALLOW UBER AND LYFT TO ENTER THE NEW YORK CITY MARKET WITHOUT FIRST PURCHASING MEDALLIONS, KNOWING THAT THIS DECISION WILL PERMANENTLY DESTROY MEDALLION VALUES** ...........................................31

A.    **Defendants Daus and Yassky Deliberately Conceal Their Plan to Allow App-Based FHVs to Enter the New York City Market** .....................................34

III.    **DESPITE THE WARNINGS IN THE ROTH REPORT, AND DESPITE KNOWING THAT APP-BASED FHVS WILL SOON BE FLOODING THE NEW YORK MARKET, TLC CONTINUES TO MAKE FALSE AND MISLEADING CLAIMS ABOUT MEDALLION VALUES** ...................................37

A.    **TLC's False and Misleading Monthly Average Sales Price Reports** ............37

B.    **TLC's False and Misleading Statements Regarding the Stability of Medallion Prices** ......................................................................................39

C.    **TLC's False and Misleading Sales Pamphlets** ....................................39

D.    TLC's False and Misleading Statements in its Taxicab Factbook .................41

IV.    TLC'S FALSE CLAIMS ARE DIRECTLY CONTRADICTED BY OMB's DATA ........................................................................................................42

V.    IN FURTHERANCE OF DEFENDANTS' FRAUDULENT SCHEME, TLC AND THE CITY LAUNCH A FALSE AND MISLEADING ADVERTISING CAMPAIGN ON TV, RADIO AND IN THE NEWSPAPERS ..................................43

A.    TLC Makes Similar False and Misleading Claims in its Newsletter "TLC Times" ...........................................................................................45

B.    Multiple TLC Staff Members Complain About the False and Misleading Nature of TLC's Ad Campaigns ..........................................47

C.    Defendants' Fraudulent Scheme and False Advertising Result in a Meteoric Rise in Medallion Prices from 2004 to 2014 ...........................48

VI.    THE ARTIFICIAL BUBBLE COLLAPSES AFTER 2014, AND MEDALLION PRICES PLUMMET ...........................................................................................49

A.    Defendant Joshi Admits That There Was an "Artificial Bubble" for Medallion Prices ..............................................................................51

B.    TLC Was Directly Responsible for Creating the "Artificial Bubble" ..........52

C.    Multiple Government Officials and Agencies Have Recognized TLC's the Role in Causing the Collapse of the Medallion Market ...........................53

VII.    CLASS ACTION ALLEGATIONS ..............................................................55

VIII.    PLAINTIFF'S FACTUAL ALLEGATIONS ....................................................60

A.    The Factual Allegations of Plaintiff Alec Soybel ...................................60

B.    The Factual Allegations of Plaintiff  Galina Kaminker ...................................64

IX.    PLAINTIFFS' RICO ALLEGATIONS ..........................................................68

A.    The TLC Enterprise ...............................................................................68

B.    The City Enterprise ...............................................................................69

C.    The Predicate Acts ...............................................................................70

        i.        The Predicate Acts for the TLC Enterprise ...........................70

        ii.       The Predicate Acts for the City Enterprise ...........................72

    D.    The Pattern of Racketeering Activity ...................................74

        i.        The Pattern of Racketeering Activity for the TLC Enterprise............**74**

        ii.       The Pattern of Racketeering Activity for the City Enterprise ...........76

    E.    The "Horizontal" and "Vertical" Relatedness of the RICO Activities...........78

    F.    The Role of Each Individually Named Defendant in the RICO scheme.........80

        i.        The Wrongful Acts of Defendants Bloomberg and Daus....................80

        ii.       The Wrongful Acts of the Freidman Defendants and Charles Fraser ...........83

        iii.      The Wrongful Acts of Defendant Fromberg ..........................84

        iv.      The Wrongful Acts of Defendants Yassky ...........................86

        v.       The Wrongful Acts of Defendant Joshi .............................88

X.    FIRST CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962(c)) (Civil RICO Claim)............................89

    A.    Plaintiffs' RICO Claims Are Timely, Since Plaintiffs Did Not Have "Inquiry Notice" of Defendants' Fraudulent Scheme Until June 24, 2019.............................................................91

XI.    SECOND CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962(d)) (RICO Conspiracy) ...............................92

XII.    THIRD CLAIM FOR RELIEF
(Violation of 15 U.S.C. §1) (Agreement Restraining Trade).......................93

    A.    Plaintiffs' Antitrust Claims Are Timely Based on Defendants' Fraudulent Concealment of Their Collusion and Price Rigging ........................94

XIII.  FOURTH CLAIM FOR RELIEF
(Unjust Enrichment under New York State Law).......................................96

**XIV.    PRAYER FOR RELIEF**................................................................................97

**XV.     DEMAND FOR A JURY TRIAL** ..................................................................98

Plaintiffs ALEC SOYBEL ("Mr. Soybel" or "Plaintiff") and GALINA KAMINKER ("Ms. Kaminker" or "Plaintiff"), (collectively, "Plaintiffs"), by their attorneys JON L. NORINSBERG, ESQ., PLLC, and COHEN & FITCH LLP, bring this action on behalf of themselves and others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendants for violations of 18 U.S.C. §1962(c) and Section 1 of the Sherman Act, 15  U.S.C. § 1, *et seq*., and for unjust enrichment, and allege the following upon information and belief, except as to those paragraphs pertaining to Plaintiffs' own actions, which are alleged upon personal knowledge.

## PRELIMINARY STATEMENT

1.       This claim arises from the fraudulent and illegal scheme by the City of New York ("City" or "Defendant City"), acting by and through its agency, the New York City Taxi and Limousine Commission ("TLC" or "Defendant TLC"), (collectively, "Defendants"), beginning no later than 2004 and continuing to at least 2017 (the "Class Period"), to artificially inflate the value of its taxi medallions by fraudulent, collusive, and deceptive means in order to maximize its own profits, with harm continuing to Class members to the present time.

2.       Defendants' conduct was so egregious that New York State Attorney General, Letitia James, Esq., felt compelled to open up an investigation into the City of New York and TLC for their fraudulent practices, which ultimately resulted in the filing of a Notice of Claim against the City alleging that the City and TLC had fraudulently inflated the prices of thousands of taxicab medallions, and profited from this fraud over a 13-year period.  (Ex. A, Attorney General Notice of Claim, dated February 20, 2020).

3.       Based on her investigation, Attorney General James concluded that the "City not only engaged in a scheme that defrauded medallion owners, but continued to further market these

1

medallions at overvalued rates *even after* internal reports raised warnings about the inflated values."
(Ex. B, Attorney General Statement) (emphasis supplied).

4.      The City Council Oversight and Investigations Committee reached a similar conclusion. As former Councilman (and now Congressman) Ritchie Torres, the Co-Chair of the Committee, stated in his opening remarks at the June 2019 hearing into the collapse of the medallion market: "the central culprit of the medallion crisis is the Taxi and Limousine Commission, which succeeded as a speculator, but failed as a regulator." (Ex. C, Transcript of Councilman Torres' Opening Statement, June 24, 2019 ("Torres Tr."), at 1).  Indeed,

> *The only thing that mattered to TLC was the holy grail of medallion values and the money it made for the City.* The City had no interest in reigning in the market and breaking up the party, because there was money to be made – billions of dollars on the backs of driver-owners who have committed suicide, or filed for bankruptcy, or [have] been condemned by crushing debt to a life of indentured servitude.

(Id. at 2) (emphasis supplied).

5.      In fact, "[o]ver time, TLC became more interested in being a speculator than in being a regulator [and] was more interested in the paper value of the medallion as an asset than it was in the real-world income of drivers or the real-world revenues of the taxi industry." (Id. at 2)  Thus, "the collapse of the medallion market, properly understood, should be remembered as *one of the greatest government scandals in the history of New York City*." (Id. at 1) (emphasis supplied).

6.      Indeed, as set forth in detail herein, the evidence of Defendants' fraudulent scheme is overwhelming. From 2004 to 2017, TLC and the City willfully, knowingly and intentionally overstated the value of taxi medallions and fraudulently concealed the fact that the value of these medallions had already begun to decline as early as 2010, as confirmed by an internal TLC report.

7.      Worst of all, the motivation behind the fraudulent acts of the TLC and the City was,

2

without question, "greed." (Ex. C, Torres Tr. at 2).  As a direct result of this fraudulent scheme, Defendant City of New York earned approximately **$855 million dollars** from medallion sales, based on direct revenues and 5% transfer taxes on each transaction on the open market, during the Class Period. (Ex. A, Attorney General Notice of Claim).

## NATURE OF ACTION

8.    Plaintiffs bring this action, on behalf of themselves and others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of similarly situated individuals who purchased a medallion license from Defendants City of New York and the New York Taxi & Limousine Commission, or any of Defendants' subsidiaries or authorized agents, at TLC auctions or on the secondary market, and who were vastly overcharged as a result of TLC having artificially inflated the value of the medallions, and whose medallions values have now collapsed.

9.    This claim arises from the fraudulent and illegal scheme, continuing wrong, and continuing offense by Defendants TLC and the City, beginning no later than 2004 and continuing to at least 2017, with harm to Plaintiffs continuing to the present day.

**A.    The Five Key Components of Defendants' Fraudulent Scheme.**

10.    Defendants' scheme to artificially inflate medallion prices involved several distinct, but related, fraudulent activities, including but not limited to, the following components:  i) creating an artificially inflated "upset price" (i.e., a minimal sales price) for medallions at TLC auctions; ii) allowing collusive bidding to take place at TLC medallion auctions, which were then also used set an artificial "floor" price  for all future medallion transactions;  iii) publishing deliberately false and misleading reports about the average monthly sales prices for medallions, knowing that the *actual*

3

medallion prices were far lower than reported;   iv) deliberately concealing an internal TLC report which stated that medallion prices had, by 2010, already "outstripped their values" (Ex. D, Report of TLC Policy Analyst Gary Roth ("Roth Report"), at 2); and v) launching a false and misleading advertising campaign that was so inherently deceptive that multiple TLC employees made complaints about the campaign.  Each of these fraudulent acts is briefly summarized below.[1]

> **i.**      **The TLC's Artificial and Grossly Inflated "Upset Price" for Medallions.**

11.    The origins of Defendants' fraudulent scheme may be traced back to the artificially inflated "upset prices," or minimum sales prices, that were first used in the 2004 TLC auctions.

12.     While TLC publicly claimed that such prices were based on actual sales transactions for medallions in the months leading up to the medallion, in fact, this claim was patently false.

13.    To the contrary, these "upset prices" for medallions were completely untethered to *actual* market conditions, and instead were unilaterally and artificially created by the TLC in furtherance of its goal to maximize "the money it made for the City." (Ex. C, Torres Tr. at 2). Moreover, these grossly inflated "upset prices" created the minimum sales prices for medallions below which the City refused to accept the purchase, or transfer of, medallions.

14.    These artificially inflated "upset prices" were used by defendants in a similar manner for all auctions held during the Class Period.  Defendants' use of such inflated prices had a profound and lasting impact on medallion prices, both at auctions and in the secondary market. It caused medallion values to rise astronomically, from $200,000.00 in 2001 to more than $1,000,000.00 in early 2014.

> **ii.**      **The Collusive Bidding at TLC's Medallion Auctions**.

---

[1]  A more detailed discussion of these fraudulent activities is set forth <u>infra.</u>, at pp. 17 - 55.

15.    Apart from using inflated "upset prices," TLC knowingly permitted collusion amongst bidders to further artificially inflate medallion values.

16.    Specifically, at medallion auctions beginning in or about and between April 2004 and October 2004, and continuing at least through June 2006, TLC accepted winning bids that were unquestionably the result of collusive bidding, as documented by the New York City Department of Investigation in its "Taxi and Limousine Commission Medallion Auction Report," dated April 2007. (Ex. E, "DOI Report").

17.    Moreover, even after receiving warnings from the New York City Law Department and the Office of Management and Budget regarding collusion – and even after receiving *concrete evidence* of collusive bidding, as documented by the DOI (Ex. E, DOI Report), TLC failed to take any remedial action whatsoever.

18.    To the contrary, TLC knowingly acquiesced to this misconduct, and directly benefitted from the collusive activity.  Indeed, as a result of the collusive bidding, a much higher minimum value was set for medallions, both at auctions and on the secondary market.  This artificially inflated value was then used to create a "floor," or minimum price, for all future medallion transactions that continued throughout the Class Period.

19.    In addition to the TLC's acceptance of these collusive winning bids, TLC adopted a position that knowingly endorsed such collusive bidding at its medallion auctions. Further, TLC deliberately misled other, non-colluding participants into believing that collusion would be strictly prohibited by the TLC, when in fact, TLC was well aware of the fact that such collusion was taking place at its medallion auctions.

      iii.       **TLC's Manipulation of Average Monthly Sales Data for Medallion Transactions.**

20.     Apart from setting up inflated "upset prices" (minimum prices), and allowing collusive bidding to further create artificially inflated "floor" prices for medallion transactions, the TLC further engaged in fraudulent and deceptive practices by intentionally overstating the monthly average price of taxi medallions published on the TLC website, and in TLC publications.

21.     Specifically, on at least 10 occasions between November 2013 and September 2014, the TLC published a knowingly false and misleading report titled "Sales-Average Prices & Numbers of Transfers," which purported to document third-party medallion transactions, and which carried the apparent legitimacy of being subject to the TLC's exclusive oversight and approval.

22.     However, in each instance during that time period, TLC overstated the actual average price of medallion transfers.

23.     In particular, TLC accomplished this sleight of hand by deliberately omitting from its calculation of monthly average prices any taxicab medallion transfers that were more than 10% below the average price from the previous month, thereby artificially and deceptively creating the appearance of a higher-than-average medallion price.

24.     The omission of such transfers from TLC's monthly reports was willful, deliberate and intentional. Indeed, as Defendant Allan Fromberg, Deputy commissioner for Public Affairs of the Commission, would later admit in an email on October 4, 2013: "the TLC long ago made a *conscious decision* to set aside any transactions below 'fair market value,' which I believe we define as within 10% of the high." (emphasis supplied).

25.     The reason for TLC's "conscious decision" to conceal lower sales prices was to intentionally inflate the reported medallion values, thereby enabling the TLC to auction medallions at

higher prices, and increase the prices on the secondary market for medallions. This, in turn, would allow the TLC to collect higher transfer taxes on behalf of New York City on private medallion sales.

26. Further, TLC never *disclosed* to the public its "conscious decision" to manipulate the medallion sales data and omit these transactions on the TLC website or in its TLC publications. Thus, medallion purchasers had no way of knowing that TLC, in its relentless drive to maximize profits as a "speculator" (Ex. C, Torres Tr. at 2), had willfully and deliberately excluded monthly sales transactions in order to artificially drive up the prices of medallions at auctions and on the secondary market.

27. TLC's fraudulent and deceitful manipulation of monthly sales data in this manner continued for several years, until this unlawful practice was finally exposed by the media in 2014.

28. However, before TLC's policy was exposed, the TLC's statements and the TLC's inflated fair market value was relied upon by medallion purchasers and owners, including the Plaintiffs in this action, in deciding whether to purchase, hold, sell or loan against their taxicab medallions.

29. In addition, prior to the media's exposure of the TLC's unlawful practice, the City failed to publicly disclose, remedy or otherwise discontinue to this unlawful policy despite its awareness that it was taking place.

### iv.    TLC's Fraudulent Concealment of the Roth Report.

30. At the same time that TLC was artificially and fraudulently pumping up medallion prices through collusion, inflated "upset" (minimum) prices for medallions, and the manipulation of monthly sales transactions, TLC knew that the medallion market was on the brink of a potentially catastrophic collapse that would wipe out the values of medallions and drive thousands of medallions

owners into financial ruin.

31.    Specifically, in or around late 2010, Gary Roth, a TLC policy analyst during 2010 and 2011, warned TLC that the price of medallions was irrationally high compared to the income that they produced.

32.    In fact, Roth memorialized the dire consequences of this artificial price inflation in a written memo (Ex. D, "Roth Report"), wherein he explicitly warned the TLC and City that if the inflated values of medallions were to decrease, "*it could force medallion buyers underwater*."   (Id. at 4)

33.    Thus, by late 2010 -- years before the medallion market collapsed and thousands of medallion owners began losing their livelihoods -- the City and TLC had actual knowledge that the quick rise of medallion prices from 2003 to 2010 had "outstripped" the "underlying value" of the asset and that a yellow cab medallion crisis was imminent.  (Ex.  D, Roth Report, at 2).

34.    Indeed, as Councilman Torres stated during the June 2019 hearing regarding the Roth Report, which the TLC had refused to turn over until right before the hearing:

> The Roth Report was written in 2010 and *it confirms that TLC and [the] city knew everything*.  TLC knew that there was speculation in the market by the likes of Gene Freidman, they knew that there was predatory lending in the medallion market, they knew that the market was at risk of collapse. And it is a damning indictment of TLC's failure as a regulator …

(Ex. C, Torres Tr., at 3) (emphasis supplied).

35.    According to the Roth Report, the reason why medallions prices had "outstripped" their values was because, by 2010, medallion owners were barely earning enough money to pay for their medallion loans and cover operating costs. Specifically, Roth estimated that it would cost approximately "$51,554 annually" for an average medallion owner to service a 15-year mortgage on

8

his or her medallion.[2] (Ex. D, Roth Report at 2). Further, it would cost "about $40,000 annually to operate a taxi by an owner-operator" in 2010. (Id.)

36.     Based on these costs alone, an average medallion owner in 2010 would have to earn **$91,554.00** just to *break even*. As Roth noted, "even with $100,000 in fares, this *barely pays for the medallion owner and operating costs*," much less basic living expenses. (Id.) (emphasis supplied). Thus, by 2010, it was already clear that medallions were grossly inflated, and that medallion loans at such inflated prices were unsustainable.

37.     Notwithstanding the fact that the City and TLC "knew everything" regarding the inflated values of medallions by 2010, Defendants willfully, deliberately and intentionally concealed the Roth Report from medallion owners, and the public at large, for a period of 9 years.

38.     In fact, it was not until June 2019 -- after having stonewalled the City Council for several weeks by claiming, falsely, that the Roth Report had been "lost" – that the TLC finally disclosed the Roth Report to the City Council and public at large.  By that time, however, it was too late.  The damage to medallion owners had already been done.

39.     In deliberately hiding the Roth Report in this manner, the City and TLC willfully engaged in the fraudulent concealment of material evidence.  The City and TLC were under an *obligation* to disclose the findings of the Roth Report to prospective medallion purchasers, since they possessed superior knowledge about two material facts -- namely, that medallion prices had "outstripped" their values by 2010 (Ex. D, Roth Report, at 2), and that the medallion market was "at risk of collapse" (Ex. C, Torres Tr., at 3) -- and medallion purchasers would have no way of knowing

---

[2] This calculation was based on a $561,600 mortgage -- representing 90% of the price of the $624,000 price for an independent medallion at that time – using an interest rate of 4.5% annually. (Ex. D, Roth Report, at 2).

these facts on their own.

40.     Further, the City and TLC knew that medallion purchasers, in the absence of such material information, would be acting on the basis of mistaken and incomplete knowledge when deciding whether or not to purchase a medallion.

41.     Likewise, the City and TLC also knew that existing medallion owners, in the absence of such material information, would be acting on the basis of mistaken and incomplete knowledge when deciding whether or not to hold onto their medallions, instead of selling them on the open market, and/or deciding whether or not to refinance their existing medallion loans.

42.     Apart from their fraudulent concealment of the Roth Report, during this same period, the TLC and City continued to sell medallions at public auctions at inflated prices, to approve the transfer of medallions in third-party transactions at inflated prices, and to encourage purchasers of medallions to borrow money to pay for their purchases in furtherance of their scheme to artificially inflate medallion values.

> **v.     Defendants' False and Misleading Advertising Campaigns About Medallions.**

43.     In furtherance of their fraudulent scheme, the City and TLC also attempted to lure potential medallion purchasers through a comprehensive campaign of false and misleading advertising, which included TV, radio, and print ads as well as adds broadcast on the TLC website and the City of New York website.

44.      These ads included repeated claims that owning a medallion was "a solid investment with steady growth" with a "return" that was "better than the stock market" and would lead to "worry-free retirement," when in fact, the City already *knew* that the medallion values had "outstripped their value" (Roth Report, Ex. D, at 2),  and, the City's own OMB office had forecasted sharp declines in

the values of individual medallions and suggested that the market for medallions was, in fact, "bearish," *not* bullish.

45.　　TLC and the City made these false claims in television ads, radio ads, newspapers ads and on the Internet ads in New York, New Jersey and Connecticut. These ads had a substantial impact on the purchasing and financial decisions of thousands of medallion buyers throughout the tri-state area.

46.　　TLC and the City also made these false claims in its weekly online magazine, www.tlcmag.com, and in the hard copy of this weekly magazine, "TLC Magazine."  Both of these publications were read by thousands of medallion owners every week throughout tri-state area.

47.　　In fact, TLC's ad campaign was so deceptive that, according to a New York Times investigation, (7) seven complaints were made by TLC staff members regarding the misleading content of the TLC's claims.

48.　　According to the Times, "some former staffers said in interviews that they believed *the ad campaign inappropriately inflated prices* by implying medallions would make buyers rich, no matter the cost. Seven said they complained." https://www.nytimes.com/2019/05/19/nyregion/taxi-mediallions.html, last viewed on March 16, 2021 (emphasis supplied).

**B.**　　**The Driving Force Behind Defendants' Medallion    Inflation Scheme: "Greed."**

49.　　As the foregoing summary makes clear, the City and TLC willfully and deliberately inflated the value of medallions to accomplish their common goal of making as much money as possible.

50.　　Specifically, the TLC and City received direct revenue from each and every medallion sold at TLC auctions. In addition, the TLC and City also received a 5% sales transfer tax for each an

11

devery medallion sold on the secondary market.

51.     Thus, by artificially inflating medallion prices at auctions and concealing lower sales prices, the TLC was able to auction medallions at higher prices, and increase the prices for medallions on the secondary market, which in turn, allowed the TLC and City to reap a direct financial benefit from higher auction sale prices *and* to collect a higher transfer tax on behalf of New York City on private medallion sales in the secondary market.

52.     In other words, by engaging in this fraudulent scheme, and by fraudulently concealing the Roth Report, the TLC and City intended to induce, and did in fact induce, Plaintiffs and other class members to: i) bid higher prices than they otherwise would have bid for the purchase of medallions at auctions; ii) purchase medallions on the open market at a grossly inflated price; iii) pay a transfer tax at a level significantly higher (5% of the inflated sales price) than they otherwise would have had to pay;  iv) hold onto, rather than sell, their medallions, based on the astronomic (but artificial) increase in the values of medallions; and v) refinance their loans based on the (non-existent) "equity" that they  believed had been built up in their medallions.

53.     As Councilman Torres put it, TLC was "more interested in the paper value of the medallion as an asset than it was in the real-world income of drivers or the real-world revenues of the taxi industry." (Ex. C, Torres Tr., at 2).

54.     Simply put, TLC and the City were driven by "greed," and "money was indeed the root of all evil" in the medallion market. (Id. at 3).

55.     And according to the City's own data, the TLC and City's greed and evil motives were rewarded handsomely, generating **more than $855 million in revenue** from auctions and transfer taxes between 2004 and 2014, which was wrongfully obtained by the City's false and misleading

representations and other wrongful conduct. (Ex. A, Attorney General's Notice of Claim).

56.     However, while the TLC and City cashed in on their fraudulent and predatory scheme, it has left the Plaintiffs and others similarly situated in utter financial ruin with medallions that had once reached a high point in value of $1,300,000.00, worth now as little as <u>$50,000.00</u> on the open market.

57.     Indeed, since most medallion owners were induced to take out loans in order to afford the high cost of medallions created by the TLC and City's intentionally false and inflated medallion prices, many have now been forced to declare bankruptcy and/or are on the verge of financial devastation, unable to meet their mortgage obligations, make car payments or even pay their basic monthly bills.

<u>**JURISDICTION AND VENUE**</u>

58.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, as well as Sections 4 of the Clayton Act (15 U.S.C. §§ 15(a)), and 28 U.S.C. §§1331 and 1367. The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d).

59.     This Court is a proper venue for this action pursuant to 18 U.S.C. §1965(a) and 28 U.S.C. §1391(b), in that this is the District in which a substantial part of the events or omissions giving rise to the claim occurred and all Defendants reside in the State of New York and at least one Defendant resides in Queens County.

<u>**THE PARTIES**</u>

**A.** **Plaintiffs**

60.     At all times hereinafter mentioned, Plaintiff ALEC SOYBEL was, and still is, a resident of the State of New York, residing at 569 Argyle Road, Apt. 20, Kings County, in the City and State of New York.

61.     At all times hereinafter mentioned, Plaintiff GALINA KAMINKER was, and still is, a resident of the State of New York, residing at 2785 West 5 Street Apt. 10A, Kings County, in the City and the State of New York.

**B.** **Defendants**

62.     At all times hereinafter mentioned, defendant THE CITY OF NEW YORK ("CITY") was and is, a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business located at 1 Centre Street, in the County and State of New York.

63.     At all times hereinafter specified, defendant NEW YORK CITY TAXI & LIMOUSINE COMISSION ("TLC") was and is, a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business located at 31-00 47th Avenue, in the County of Queens, in the City and State of New York.

64.     Defendant TLC is an administrative agency for the City of New York, created by Section 2300 of the New York City Charter. At all times relevant hereto, the TLC was and is responsible for enforcing the statutes and regulations pertaining to the taxi industry in the City of New York.

65.     At all times hereinafter mentioned, defendant MATTHEW W. DAUS, ESQ. ("Daus"), was the Chair and Chief Executive Officer of the TLC.  He was responsible for taking the

actions challenged in this proceeding from 2001 to 2010.

66.    At all times hereinafter specified, defendant DAVID YASSKY ("Yassky") was the Chair and Chief Executive Officer of the TLC.   YASSKY was responsible for taking the actions challenged in this proceeding from 2010 to 2014.

67.    At all times hereinafter specified, defendant MEERA JOSHI ("Joshi") was the Chair and Chief Executive Officer of the TLC.  Defendant JOSHI was responsible for taking the actions challenged in this proceeding from 2014-2019.

68.    At all times hereinafter specified, Defendant ALLAN FROMBERG ("Fromberg") was the Deputy Commissioner for Public Affairs of the Taxi and Limousine Commission, and was responsible for creating, managing, and supervising all aspects of TLC's public relations and advertising campaigns on the Internet, in publications and in targeted mailings by the TLC.

69.    At all times hereinafter specified, Defendant CHARLES R. FRASER ("Fraser") was the Deputy Commissioner for Legal Affairs and General Counsel for the TLC, and was responsible for creating, managing and supervising the TLC auctions at which medallions were sold.

70.    At all times hereinafter specified, Defendant MICHAEL BLOOMBERG ("Bloomberg") was the Mayor of Defendant City of New York, and was responsible for taking the actions challenged in this proceeding from 2004 to 2014.

71.    At all times hereinafter specified, Defendant EVGENY FREIDMAN ("Freidman") was an owner of approximately 900 taxi medallions, and a broker who sold and/or leased such medallions to third parties. As set forth below, Defendant Freidman was the leader of a collusion and price-fixing scheme that took place in multiple medallion auctions between April 2004 and June 2006.

15

72.     At all times set forth herein, Defendant FREIDMAN was and is a resident of the State of New York, residing at 136 East 65th Street, in the County, City and State of New York.

73.     At all times hereinafter specified, Defendant VLADMIR BASIN was the owner of a large number of taxi medallions, and a licensed broker who sold and/or leased such medallions to third parties.

74.     As set forth below, Defendant BASIN was a friend, acquaintance and colleague of Defendant Freidman, and was a central participant in the collusion and price-fixing scheme that took place at the TLC medallion auctions held between April 2004 and June 2006.

75.     At all times set forth herein, Defendant BASIN was a resident of the State of New York, and is currently residing at 5750 Collins avenue, Apartment 3H, Miami Beach Florida, 33140.

76.     At all times hereinafter specified, Defendant MAMED DZHANIYEV ("DSHANIYEV") was an owner of a large number of taxi medallions, and a broker who sold and/or leased such medallions to third parties. As set forth below, Dzhaniyev was a friend, acquaintance and colleague of Defendant Freidman, and was a central participant in the collusion and price-fixing scheme that took place at the TLC medallion auctions held between April 2004 and June 2006.

77.     At all times set forth herein, defendant DZHANIYEV was and is a resident of the State of New York, residing at 175 Jaffrey, in the County of Kings, in the City and State of New York.

I. **FACTUAL BACKGROUND OF THE RICO CONSPIRACY**

78.     As the aforementioned summary makes clear, spanning over the course of a decade,

16

the TLC and City -- in their relentless pursuit of the "holy grail of medallion values" and "the money it made for the City" (Ex. C, Torres Tr. at 2) -- effectuated an intentionally fraudulent scheme to generate massive amounts of revenue for the City, which resulted financial devastation ad catastrophe to hundreds of individuals.

79.     Although the scheme was simple -- intentionally deceiving trusting, would-be medallion investors into purchasing taxi medallions at purposely inflated rates in order to extract profit -- the mechanics of this fraud, as well as its scope, depth and the players involved were not.

80.     As will be discussed herein, this fraudulent scheme was premeditated and intentional, requiring numerous participants and years of carefully designed lies, omissions and deception at the highest levels of City government. And while perhaps only Hollywood could have crafted a more nefarious tale of financial conspiracy and deception, to the victims in this case who were bilked for hundreds of millions of dollars, the very real effects of this massive fraud perpetuated by the TLC and the City are a nightmare from which they only wish they could awaken.

**A.     The Origins of the Fraudulent Scheme: Bloomberg Orders TLC to Sell Over 1000 Medallions to Close the City's Budget Deficit.**

81.     Defendants Bloomberg and Daus were the chief architects behind Defendants' fraudulent scheme to artificially inflate medallion values. The scheme was initially devised as a "quick fix" to the plug the hole in the substantial budget deficit that existed in 2003. Specifically, in July 2003, Defendant Michael Bloomberg was facing a $3.8 billion budget deficit, and was publicly stating that he may need to order layoffs in order to close the budget gap.

82.     However, Bloomberg knew that laying off City workers would be highly unpopular

17

and would reflect badly on his leadership as Mayor of the City of New York. Rather than choosing this politically damaging option, Bloomberg, acting in concert with Daus, devised the scheme of selling a large number of medallions in order to create a quick way to generate substantial revenue for the City of New York

83.     Consequently, Bloomberg ordered the sale of 1,000 new medallions. The medallions would be sold at various TLC auctions over a three-year period. Thereafter, Bloomberg, working in concert with Defendant Daus, set up artificial "floor" or "upset prices" (minimum prices) below which bids on medallions would not be accepted, as detailed below.

**B.     In Furtherance of Defendants' Scheme, TLC and The City Set Grossly Inflated "Upset Prices" to Establish an Artificial Floor for Medallion Values.**

84.     The first critical component of defendants' fraudulent scheme was the use of artificially inflated "upset prices" (minimum prices) at the 2004 auctions.

85.     While the TLC has since attempted to distance itself from the medallion collapse, one of the TLC's primary responsibilities in connection with medallion auctions was, in fact, to establish the minimum bid price, or "upset price," for medallions.

86.     In early 2004, TLC and the City set the minimum "upset prices" for the new medallions which were to be sold at a closed bid auction in April 2004. In accordance with the rules promulgated by TLC's commissioners, the (vastly inflated) "upset prices" for these medallions were set as follows: $550,000.00 for each lot of two standard corporate (mini-fleet) medallions; $495,000 thousand for each lot of two alternative fuel/wheelchair accessible vehicle corporate medallions; $233,000.00 for each individual medallion; and $210,000.00 for each alternative fuel-wheelchair accessible vehicle individual medallion.

87.     At the time that these prices were announced, the TLC publicly claimed – falsely –

that these "upset prices" were based upon a six-month average of medallion price sales in consultation with DOT and the Mayor's Office of Management and Budget.

88.     This was an outright lie.  In fact, TLC has *no record* whatsoever of how it actually determined upset prices at the April 2004 auction, or for any auction thereafter.

89.     As a result, the "upset prices" set by the TLC were *not* tethered to any actual market data provided by DOT and the Mayor's Office of Management and Budget .  Rather, the TLC, in its role as "speculator" (Ex. C, Torres Tr., at  2), and in its blind pursuit of the "the holy grail of medallion values and the money it made for the City" (id.), simply chose "upset prices" at the highest level possible to maximize income for the City and TLC.  The TLC did so at the behest of Defendants Bloomberg and Daus.

90.     Thus, the initial "upset prices" set for the April 2004 were grossly inflated and far in excess of what the average medallion prices were selling for at that time.

91.     Far from having any scientific basis, these prices were literally made up out of whole cloth by the TLC, designed to answer defendant Bloomberg's call to generate as much money as possible from the sales of medallions.

92.      As a direct result of TLC's manufactured "upset price" for medallions, the price for such medallions were already artificially inflated prior to the first bid taking place.

93.     Thereafter, TLC and the City continued to use grossly inflated "upset prices" to establish an artificial floor on the medallion market, and to artificially increase the prices of such medallions for all of the subsequent auctions that were held between April 2004 and March 2014.

94.     Further, TLC and the City *also* required potential sellers and/or purchasers to seek exemptions from the City prior to executing a sale of a medallion that took place below the "fair

19

market value" that the City had determined to be the appropriate sales value.

95.     In other words, not only were defendants falsely inflating and manipulating the market price for medallions at the outset, but Defendants were also creating impediments to selling below those price points as should otherwise be permitted in the free market, thereby ensuring that medallion values remained artificially high and consistent with the inflated "upset prices" that were being used at auctions.

**C.     TLC Turns a Blind Eye to Collusion at Several Auctions, and Then Uses These Artificially Inflated Prices to Set New, Unprecedented Values for Medallions.**

96.     The second component of Defendants' fraudulent scheme was their knowing use of collusion to artificially increase medallion prices. This collusion took place at all of the 2004 and 2006 auctions, as confirmed by an investigation conducted by the New York City Department of Investigation ("DOI"). (Ex. E, Taxi and Limousine Commission Medallion Auction Report, dated April 2007, "DOI Report").

97.     Specifically, on June 21, 2006, DOI was asked by the New York City Law Department to look into whether identical bids made by three bidders at the June 16, 2006 public auction of 54 and taxi medallions were the result of illegal collusion or violation of any other law rule regulation that governs these auctions.

98.     This request was made as a result of an observation by a representative of the New York City Office of Management and Budget, who determined that at the June 16, 2006 TLC auction, three bidders made *multiple identical bids for medallions* and thereby collectively won all 54 medallion several auctions.

99.     The three bidders were Defendants Evgeny Freidman ("Freidman"), Vladimir Basin ("Basin") and Mamed Dzhaniyev ("Dzhanieyev"), (collectively, the "Freidman Defendants").   All

three were known to the TLC as owners of taxi medallions and partners in taxi-related businesses.

100.    In response to the Law Department's inquiry, DOI examined the facts and circumstances surrounding the June 16, 2006 auction, as well as the subsequent medallion auction held on June 22, 2006 and three prior auctions held in 2004.

101.    In each of these other auctions the same bidders, Evgeny Freidman, Vladimir Basin and Mamed Dzhaniyev, along with other individuals, made identical bids in a fashion similar to the identical bids they made in the June 16, 2006 auction

102.    The bid package submitted by each of the bidders in connection with the June 16 2006, and June 22, 2006 auctions included a TLC official bid form (the "Bid Form"), on which each bidder was required to certify the price he or she was bidding on the medallions. (Exhibit H, Bid Form).

103.    Among other things, the Freidman Defendants were each further required to certify, in all capitals, as follows: "I FURTHER CERTIFY THAT I HAVE NOT COLLUDED, CONSULTED, COMMUNICATED, OR AGREED IN ANY WAY WITH ANY OTHER BIDDER OR PROSPECTIVE BIDDER FOR THE PURPOSE OF RESTRICTING COMPETITION."  (Id.) (original emphasis).

104.    The Freidman Defendants were also required to certify as follows: "I FURTHER CERTIFY THAT I HAVE NOT DISCLOSED ANY BID PRICE EITHER DIRECTLY OR INDIRECTLY TO ANY OTHER BIDDER FOR THE PURPOSE OF RESTRICTING COMPETITION OR INDUCING ANY OTHER PROSPECTIVE BIDDER TO SUBMIT OR NOT SUBMIT A BID FOR THE PURPOSE OF RESTRICTING COMPETITION."

105.    In addition, in signing the bid form, each of the Freidman Defendants was required to certify that, inter alia, "I have arrived at the above bid amount by my *own free independent evaluation*,

21

and I have *not entered into any agreement relating to this bid with any other competing bidder*."
(emphasis supplied).

106.    Despite attesting to this fact, each of these three investors placed three sets of *identical bids* – down to dollars and cents – for the exact same number of medallions. Specifically, each of the Freidman Defendants bid exactly **$477,666.50** per medallion for 18 medallions, as well as **$453,722.00** per medallion for another 18 medallions and **$416,278.00** per medallions for the remaining 18 medallions

107.    Not surprisingly, the Freidman Defendants' bids of $477,666.50 per medallion -- a price that was far in excess of the actual value of medallions at that time -- turned out to be the winning bids.

108.    As a result of the collusion by the Freidman Defendants a new "floor" price (minimum price) was set for all future medallion transactions. Stated differently, now the new market value for medallions was $477,666.50.

109.    Both the City of New York and TLC directly benefitted from the artificially inflated prices caused by the Freidman Defendants' collusion.   As a result of these inflated prices, the City and TLC collected additional revenue from every medallion sale at the auctions, as well as from the 5% sales transfer tax of every purchase on the secondary market.

110.    Moreover, through the use of the exemption requirement, which mandated that any seller seek approval from the TLC and City before making any medallion sale below market value, defendants were able to ensure that no seller could readily sell below market value even if they desired to do so.

111.    Correspondingly, as the owner of 900 medallions, Freidman received an enormous

22

individual financial benefit from this artificial increase in medallion prices. In particular, whatever the original cost Freidman had paid to acquire the new medallions, this cost was greatly exceeded by the new, and vastly increased market value of all the other medallions that he already owned.

112.    Likewise, the other Freidman Defendants benefitted in the same manner.  While they did not own as many medallions as Freidman, they owned a large number of medallions between them, and the combined value of these medallions had drastically increased, overnight, as a result of the Freidman Defendants' collusive activities.

**D.    TLC Deliberately Ignores Concerns Raised by OMB and the Law Department, and Allows Two More Collusive Auctions to Be Held in June 2006.**

113.    Notwithstanding the concerns raised by OMB and the New York City Law Department about the June 16, 2006 auction, on June 22, 2006, TLC held two other auctions: one for the public sale of 124 alt-fuel, mini-fleet taxi medallions and one for the public sale of 130 independent, alt-fuel taxi medallions. The procedures, certifications and oversight (or lack thereof) that were in place for the June 22, 2006 auction were the same as had been in place for the June 16, 2006 auctions.

114.    According to TLC records, Freidman, Basin and Dzhaniyev *again* submitted *identical bids* in the alt-fuel, mini-fleet medallion auctions, this time joined by four other additional individuals who were associated with Freidman.

115.    Specifically, in the June 22, 2006 alt-fuel medallion auction, each of these individuals submitted bids of **$517,722.00** per medallion for varying numbers of medallions.

116.    The total medallions bid on by the Freidman Defendants amounted to 40 out of the 124 independent alt-fuel medallions that were bid upon at this auction.

23

117.     In its Taxi and Limousine Commission Medallion Auction Report, dated April 2007, DOI concluded that *all* of the individuals in the Freidman group did, in fact, know and or were associated with Freidman, in one way or another.  (Ex. E, DOI Report).

118.     The TLC was made aware of this fact but took no action whatsoever.  Instead, it chose to stand idly by and reap the financial benefits of the Freidman Defendants' collusion, which had greatly increased the sales prices of medallions.

### E.     TLC Facilitates the Freidman Defendants' Collusion by Changing its Rules at the 2006 Auctions.

119.     TLC not only knowingly acquiesced in the Freidman Defendants' collusion, but also, they actually changed their rules to help facilitate such collusion.

120.     Specifically, just prior to the June 2006 auctions, TLC made a critical change in its bidding rules at the behest of the Freidman Defendants.  The TLC Rules had previously mandated that bids were to be accompanied by an initial deposit of $2,000.00, followed by a second deposit of $25,000.00 upon notification to the bidder of a winning bid, for a total deposit of $27,000.00 per medallion for each winning bidder.

121.     However, due to lobbying efforts by the Freidman Defendants, among others, the TLC rules were amended on May 17, 2006 to eliminate the second deposit of $25,000.00, leaving only the initial deposit of $2,000.00 to be paid by every bidder.

122.     Defendant Fraser, as General Counsel for TLC, was directly involved with the decision to change TLC's Rules prior to the 2006 auctions, as the Freidman Defendants had lobbied him to do. Specifically, Fraser supervised the revision of the auction rules. Further, Fraser supervised Assistant General Counsel Chris Wilson, who was specifically assigned to provide legal advice to TLC Project Manager Eric Kim, who had direct responsibility for conducting the auction.

24

123.    As a result of this rule change, for the June 16, 2006 and June 22, 2006 auctions, only a deposit of $2,000.00 was required to be submitted with each medallion bid, with no second deposit of $25,000.00 required for winning bidders.

124.    This change in TLC rules greatly facilitated the collusion and price-rigging by the Freidman Defendants at the 2006 auctions.  Essentially, it allowed the Freidman Defendants – who were essentially the main bidders – to freely manipulate the prices of medallions without the burden of making substantial monetary deposits for each bid.

125.    Further, this rule change alleviated the Freidman Defendants' risk of losing a large amount of money if they were to decide -- after successfully driving up the price of medallions -- to not actually purchase *all* of the medallions for which they had winning bids. This is so because TLC rules require that the deposit be *forfeited* should a winning bidder decide not to close on any of their winning bids.

**F.      Despite Recognizing that The Freidman Defendants' Bids "Appeared to Be a Scam," TLC Turns a Blind Eye to Their Collusion.**

126.    As part of its investigation into the collusion of the Freidman Defendants, the Department of Investigation questioned certain officials from the TLC who played a role in the 2004 and or 2006 auctions.  Specifically, DOI questioned these officials about, inter alia: i) the auction process; ii) the non-collusion clause of the TLC bid form; and iii) the identical bids submitted by Freidman, Basin and Dzhaniyev.

127.    The highest-ranking TLC official interviewed by DOI was defendant Charles R. Fraser, the Deputy Commissioner for Legal Affairs and General Counsel for the TLC.  Fraser was directly involved with supervising the revision of the auction rules in connection with the 2006 auctions.

128.    Fraser was asked about the bid results from the June 16, 2006 auction, which reflected three sets or tiers of identical bids from the Freidman Defendants, which appeared to clearly be the result of pre-bid communication between these bidders.

129.    In his interview with DOI, Fraser acknowledged that "the June 16 2006 bids *appeared to be a scam*."   Nonetheless, Fraser insisted that there was "there was nothing improper or illegal in terms of the TLC rules and regulations." This was an outright fabrication.

130.    In fact, the non-collusion clause in TLC's bid form *expressly prohibits* bidders from consulting with each other about their bid amounts prior to the medallion auctions. Specifically, the bid forms require each and every bidder to certify that, <u>inter</u> <u>alia</u>, they have not: i) "colluded, consulted, communicated, or agreed in any way with any other bidder or prospective bidder for the purpose of restricting competition"; ii) "disclosed any bid price either directly or indirectly to any other bidder for the purpose of restricting competition or inducing any other prospective bidder to submit or not submit a bid for the purpose of restricting competition"; and iii) "entered into any agreement relating to this bid with any other competing bidder."

131.    Notwithstanding this plain wording, Fraser insisted that the multiple, *identical* bids submitted by the Freidman Defendants – to the dollar – were not in violation of the TLC's anti-collusion policies, even though each of these Defendants had certified on the Bid Form, falsely, that the respective bids were made individually rather than jointly or as a Corporation.

132.    Fraser's refusal to condemn the unlawful collusion activities of the Freidman Defendants is evidence that the TLC itself was *complicit* in these activities. Under pressure to generate ever increasing revenue -- so as to satisfy defendant Bloomberg's relentless pressure to use medallion sales to close large gaps in the City's budget -- TLC knowingly acquiesced, and thus ratified, the

26

unlawful collusion activities by the Freidman Defendants.

133.    Despite complaints by OMB and the New York City Law Department, the TLC simply looked the other way and allowed the collusion to take place, thereby generating massive amounts of revenue that otherwise would not have existed had the collusion not taken place.

134.    The TLC has the express authority to invalidate auctions based on improper activities and/or incorrect information on Bid Forms, and in fact, had done so many times in the past.  However, when it came to the Freidman Defendants, TLC took no corrective action and instead allowed the artificially created bid prices to stand.

### G.    TLC also Overlooks the Freidman Defendants' Collusion at the April 2004 and October 2004 Auctions.

135.    TLC not only turned a blind eye to the collusion by the Freidman Defendants at the 2006 auctions, but also, it ignored their collusion at the 2004 auctions as well.

136.    In fact, as confirmed by the DOI Report, Freidman, Basin and Dzhaniyev had *also* made identical bids in their April 16, 2004 unrestricted corporate medallion auction, the October 15, 2004 accessible medallion auction, and the October 15 2004 alt-fuel medallion auction.

137.    In all three 2004 auctions, the Freidman Defendants each made multiple tiered identical bids, in much the same fashion that they had bid in the June 16, 2006 auction.  A significant number of these bids were the winning bids.

138.    Just as the Freidmans' collusion had done in 2006, their collusion in the 2004 auctions likewise had direct and significant impact on inflating the value of medallions.  Whereas individual medallions were valued at $224,958.00 in 2003, their valued spiked dramatically upward in 2004 to $277,583.00. Similarly, corporate medallions jumped from $260,917.00 in 2003 to $315,636.00 in 2004.

139. The Freidman Defendants' collusion in the 2004 auctions artificially inflated prices not only in subsequent auctions, but on the secondary market as well because of the fact that all future secondary market transactions would use the artificially inflated "floor" prices (minimum prices) established from the previous TLC auctions.

140. Once again, both the City of New York and TLC directly benefitted from the artificially inflated prices caused by the Freidman Defendants' collusion. As a result of these inflated prices, the City collected additional revenue from each and every medallion sale at the auctions, as well as the 5% sales transfer tax of each and every purchase on the secondary market.

## H.    After TLC Allows Collusion to Repeatedly Occur, Medallion Prices Soar to Unprecedented Highs.

141. The collusion by the Freidman Defendants, and the knowing acquiescence of TLC to such collusion, had the effect of artificially increasing the prices of all medallions that were sold at all *16 (sixteen) auctions* from 2004 to 2014.

142. At auctions held in April and October 2004, bids for medallions reached a high of $360,000 for a single independent medallion and $815,103.00 for a package of two corporate medallions ($407,551.99 each)

143. At the subsequent auction held in June 2006, medallion prices surpassed the 2004 numbers. Independent medallions sold at a high of $425,102.00 while a package of two corporate medallions reached $1,108,295.00 ($554,147.50 each).

144. At the May 2008 auction independent medallions sold for $524,000.00 and a package of two corporate medallions sold for as much as $1,312,000.00 ($656,000.00 each).

145. The City did not hold any auctions between 2009 and 2012. However, the value of medallions continued to rise on the secondary market, based on the artificially created and

fraudulently increased values from the prior collusive auction prices, and the projected rates of increase resulting from same.

146.    For example, in August 2009, corporate medallions transferred at an average of almost $1,500,000.00 for a package of two ($750,000.00 each). The upward trend continued through 2012 when, in September of that year, a package of two corporate medallions transferred for $2,250,000 ($1,250,000.00 each)

147.    The TLC was well aware of the connection between the artificially inflated medallion prices at auctions, on the one hand, and the artificially inflated prices on the open market, on the other. As Defendant Matt Daus, the TLC Commissioner from 2002-2010, explained in an interview with Bob Herbert on Op-Ed TV on July 2, 2018, *Matthew Daus on the For-Hire Transportation Battle*: "[the medallion price] just shoots up because its highest bidder, and *that became the new normal*."

148.    In other words, after each auction, the highest price paid for a taxi medallion at the auction -- even if resulting from unlawful collusion and a grossly inflated "upset price" -- became the lowest price that a prospective buyer could pay for a medallion on the secondary market.

149.    However, because TLC and the City benefited greatly as the result of their fraudulent manipulation of medallion prices, their desire to generate revenue  overrode their obligation to regulate the taxi industry, and they allowed these unlawful practices to continue until the very end.

150.    Indeed, according to the City's own data, the City received approximately **$359,000,000** in revenue in just the three auctions held in November 2013, February 2014 and March 2014 alone, and more than $855,000,000 in revenue from auctions and transfer taxes between 2004 and 2014, which were tainted by the City's false and misleading representations and other wrongful conduct. (Ex. A, Attorney General Notice of Claim).

I.      **While Medallion Values Skyrocket, an Internal TLC Report Warns TLC of the Potential Collapse of the Medallion Market, but TLC Hides the Roth Report from the Public.**

151.    The meteoric rise of medallion prices was, in fact, an illusion. By 2010, Defendants well *knew* that medallion values were not only significantly overpriced, but were destined to collapse.

152.    Specifically, unbeknownst to Plaintiffs and Class members, in late 2010, a TLC policy analyst named Gary Roth, an urban planner with two master's degrees, wrote a 5-page internal memorandum warning that medallions were already selling for prices that well exceeded their actual value.

153.    According to a New York Times investigation, "almost immediately, [Roth] noticed something disturbing: the price of a taxi medallion – the permit that lets a driver own a cab – had soared to nearly $700,000 from $200,000. In order to buy medallions, drivers were taking out loans they could not afford."  https://www.nytimes.com/2019/05/19/nyregion/taxi-medallions.html, last viewed on March 16, 2021.

154.    Recognizing the dangers posed by such inflated prices, "Mr. Roth complied his concerns in a report and he and several colleagues warned that if the City did not take action, the loans would become unsustainable and the market could collapse."  Specifically, Roth argued that a significant drop in medallion values could force medallion buyers "underwater" and cause significant turmoil in the medallion market. (Ex. D, Roth Report, at 4).

155.    Knowing that the release of the Roth Report would cause severe damage to medallion values, Defendants knowingly and deliberately hid this report from the public for almost 9 (nine) years. It was not until the Council for Oversight and Investigation subpoenaed the Roth Report that it was finally disclosed by TLC on June 24, 2019. (Ex. C, Torres Tr. at 3).

30

## II.   TLC FRAUDULENTLY CONCEALS ITS PLAN TO ALLOW UBER AND LYFT TO ENTER THE NEW YORK MARKET WITHOUT FIRST PURCHASING MEDALLIONS, KNOWING THAT THIS DECISION WILL PERMANENTLY <u>DESTROY MEDALLION VALUES.</u>

156.     The TLC not only hid the Roth Report, but also, it fraudulently concealed a monumental change that was about to occur in the taxi industry, namely: allowing Uber and Lyft, and other app-based taxis, to enter the New York City market *without needing to purchase a medallion*.

157.     The origins of this plan may be traced back to a meeting that took place on September 25, 2012, between Defendant Daus and Defendant Yaasky.

158.     At this meeting, a plan was secretly hatched between Daus, the past TLC Commissioner, and Yassky, the TLC Commissioner, regarding the potential entry of app-based taxi companies, such as Uber and Lyft, into the New York City market.

159.     At this meeting, a decision was reached that would have a devastating impact on the yellow taxi industry: Uber and Lyft, and other app-based taxi companies, would be allowed to enter into the New York City market *without the need to purchase a medallion*.

160.     Under this plan, TLC would treat all app-based companies, including Uber and Lyft, as if they were "Black Car" cooperatives, just as traditional (non-app-based) For-Hire Vehicles ("FHVs") -- such as private taxis, luxury cars and limousines -- had always been designated.

161.     However, as Daus and Yassky well knew, Uber and Lyft, and other similar app-based cab companies, did *not* meet the mandatory requirements for such a designation.  Unlike traditional FHVs, Uber and Lyft vehicles were *not* assigned to a specific base, and were *not* being dispatched by a central dispatcher.  Thus, there was no lawful basis for characterizing these app-based companies as "Black Car" services.

162.     Nonetheless, Daus and Yassky decided to allow app-based cab companies, such as

31

Uber, Lyft, GetTaxi (later, "Gett") and other similar e-hail companies, to enter the New York City market without first needing to purchase a medallion, virtually ensuring that they would capture a disproportionate share of the City's taxi market.

163.    Further, Daus and Yassky decided to allow such app-based companies to enter the New York market without *any* limit as to how many of their cars could enter this market, and without *any* restrictions on the number of years for them to enter into the New York City market.

164.    As a direct result of Daus and Yassky's plan, drivers from app-based car companies, such as Uber and Lyft, would be able to compete in the same market without having *any* financial burdens.

165.    Instead of having to take out a large loan to finance the purchase of a medallion -- as virtually *all* medallion owners had to do – drivers from app-based companies, such as Uber and Lyft, would be able to freely enter the market without any such burdens.

166.    Moreover, at this same meeting on September 25, 2012, Daus and Yassky decided that the new e-hail taxis would be *completely exempt* from the burdensome regulations and restrictions that medallion owners were required to face every day.

167.    Further, unlike medallion owners, drivers from app-based companies would be able to service *entire* the New York metropolitan, not just those areas specifically authorized by the TLC.

168.    The plan hatched by Daus and Yassky gave drivers from app-based companies, such as Uber and Lyft, an enormous -- and patently unfair -- competitive advantage over medallion owners. Indeed, the plan hatched by Daus and Yassky on September 25, 2012 would prove to be the death knell for the entire yellow taxi industry.

169.    Already on the verge of collapse -- due to *years* of artificially inflated medallion

values, as detailed above -- the plan hatched by Defendants Daus and Yassky would prove to be the *coup de grace* for the New York yellow taxi industry.

170.    In particular, the removal of any need to purchase a medallion led to massive flooding of the New York City market with app-based FHVs. Whereas before there had only been 13,000 medallion taxis servicing the entire New York metropolitan region, within a matter of years, **120,000 FHVs** would be servicing this same metropolitan area.

171.    The disastrous impact on the yellow cab industry was not only forseeable, but entirely predictable.

172.    Indeed, both Daus and Yassky knew, to an absolute certainty, that their decision to allow app-based cab companies into the New York City market -- without first requiring such companies to purchase a medallion, and without imposing any of the burdensome regulations on such app-based companies that were imposed on medallion owners -- would forever change the taxi landscape in New York, and would single-handedly destroy the market for medallions.

173.    In making this decision, Daus and Yassky flagrantly violated TLC's obligation to "[e]stablish and enforce standards to ensure that all [Taxicab] licenses are and *remain financially stable*," as required by Title 35 of the Rules of the City New York § 58-03(ff) (emphasis supplied).

174.    Moreover, Daus' role in hatching this plan was a shocking betrayal of trust.   Just 8 (eight) years earlier, Daus had told Plaintiff Alec Soybel, and other similarly situated Class members, that medallions were as "good as gold," that purchasing a medallion was secure because TLC had a "monopoly" over taxis in New York, that TLC would "100%" protect  medallion owners, and that owning a medallion would lead to a "worry-free retirement."

175.    Contrary to what Daus had falsely told medallion owners just 8 (eight) years earlier,

33

TLC was now going to do everything in its power to *destroy* the very drivers who had built up the yellow taxi industry and allowed it to reach such soaring heights.

176.    Daus himself was instrumental in engineering this treacherous betrayal of medallion owners. Without a moment's hesitation, Daus callously abandoned medallion owners and destroyed their very livelihoods -- "condemn[ing] [them to] crushing debt [and] a life of indentured servitude" (Ex. C, Torres Tr. at 2) -- so that he could pursue bigger and better opportunities for himself, as discussed below.

**A.    Defendants Daus and Yassky Deliberately Conceal Their Plan to Allow App-based FHVs to Enter the New York City Market.**

177.    After conceiving of the plan to allow FHV's into New York without purchasing a medallion, Defendants Daus and Yassky then made a conscious decision to conceal the truth about the impending changes to the yellow taxi industry. Each Defendant had different reasons for concealing this plan.

178.    Defendant Yassky wanted to hide the truth regarding the FHV plan that he had hatched with Daus, because he knew that disclosure of this information would materially impair, if not destroy altogether, TLC's ability to continue to selling medallions at inflated prices at the 2013 and 2014 auctions.

179.    Further, Yassky knew that disclosing this information would destroy the ability of prospective medallion purchasers to obtain loans, because if lenders were to learn *the truth* about medallion values -- namely, that they were grossly inflated and were about to suffer a monumental collapse, due to the onslaught of app-based taxis entering the New York market -- they would no longer be willing to make such loans to finance the purchase of medallions and/or to refinance existing medallion loans.

180.    Likewise, Defendant Daus wanted to hide the truth regarding the app-based FHV plan that he had concocted with Yassky, because he knew that disclosure of this information would have an adverse impact on his new career in the private sector.  Specifically, after leaving the TLC, Daus had started a new career as the Founder and Chair of the Transportation Practice Group at Windels, Marx, Lane and Mittendorf, LLP.

181.    Daus knew that there would be fierce opposition to this plan from medallion owners, so Daus needed sufficient time to lay the proper groundwork for the entry of app-based FHVs into the New York City market before this plan was publicly disclosed.

182.     Daus knew that his role at the forefront of bringing such app-based FHVs – and in particular, Uber and Lyft – into the New York City market would catapult his career in the private sector, and would allow him to create a highly lucrative national and international practice in the transportation industry based on his success in the New York City market

183.    Specifically, Daus was the head of the International Association of Transportation Regulatrs ("IATR"), a professional association of government officials and leaders in the transportation industry.  In this capacity, Daus stood to gain very large consulting fees by guiding app-based cab companies, such as Uber and Lyft, as to how to enter other major metropolitan areas without purchasing a medallion, just as he and Yassky had done in New York.

184.    Thus, both Daus and Yassky made a conscious decision to conceal from medallion owners, as well as prospective medallion owners and the public at large, their plan to allow app-based FHVs into the New York market without any need to purchase a medallion.

185.    Daus and Yassky, and by extension, the TLC, were under an obligation to disclose this information to prospective medallion purchasers, since they possessed superior knowledge about

a material fact -- the monumental change that would occur in the yellow taxi industry by allowing app-based companies to enter the New York market without first purchasing a medallion -- and medallion purchasers would have no way to obtain this information on their own.

186.    Further, Daus and Yassky knew that medallion purchasers, in the absence of such information, would be acting on the basis of mistaken and incomplete knowledge when deciding whether or not to purchase a medallion.

187.    Daus and Yassky also knew that medallion owners, in the absence of such information, would be acting on the basis of mistaken and incomplete knowledge when deciding whether or not to hold onto their medallions, instead of selling them on the open market.

188.    Apart from concealing this material information about app-based FHVs entering the New York market, Yassky also continued to affirmatively make false and misleading statements about medallion values.

189.    Specifically, despite knowing that the plan to allow app-based FHVs to flood the New York market would have a disastrous impact on medallion values, Yassky continued to make blatantly false statements about medallion values and how "highly profitable" owning a medallion would be to prospective buyers.

190.    Yassky made these false statements knowingly and intentionally, for the deliberate purpose of deceiving prospective medallion owners at both the 2013 and 2014 auctions -- as well as prospective medallion purchasers on the secondary market during this time period -- regarding medallion values, knowing full well that the entry of app-baesd FHVs into the New York market would destroy the value of medallions.    The TLC likewise continued to make affirmative misstatements regarding medallion values, as set forth below.

### III. DESPITE THE WARNINGS IN THE ROTH REPORT, AND DESPITE KNOWING THAT APP-BASED FHVS WILL SOON BE FLOODING THE NEW YORK CITY MARKET, TLC CONTINUES TO MAKE FALSE AND MISLEADING CLAIMS ABOUT MEDALLION VALUES.

191.    Notwithstanding the warnings contained in the Roth Report, and despite knowing about the devastating impact that allowing app-based FHVs to enter the NYC market would have on medallion values, the TLC continued to market the medallion as a "solid investment" that was "better than the stock market."

192.    Specifically, in furtherance of Defendants' fraudulent scheme, TLC and the City published false and misleading claims in its reports, including but not limited to: i) TLC's monthly "Sales-Average Prices & Numbers of Transfers" reports;  ii) TLC's reports on the stability of medallion prices; iii) TLC's sales pamphlets; and iv) TLC's Taxicab Factbook.

#### A.    TLC's False and Misleading Monthly Average Sales Price Reports.

193.    For many years, including in the months prior to the final auctions held in 2014, the TLC regularly published the average sale price for both individual and corporate taxi medallions. Because TLC was required, by its own rules, to approve every sale and participate in every closing, it knew exactly *every actual sales price*, and in fact, maintained records of these prices.

194.    In the months leading up to the auctions, however, the TLC routinely overstated the average price of a medallion in the materials it made available to the public. This unlawful practice, in turn, helped to artificially increase the values of medallions both at auctions and on the secondary market.

195.    For example, in September 2013, the TLC reported average medallion prices of $1,050,000.  However, only four individual medallions were sold that month, and the highest

(artificially inflated) sales price was for $1,000,000. The sales price for the other 3 transfers was between $925,000 and $950,000.00. Thus, it was *impossible* for the "average" medallion sales price in September 2013 to have been $1,050,000.00, as the TLC had falsely claimed. The TLC's reported average sales prices was false and misleading.

196.    Likewise, in November 2013, the TLC reported average individual medallion prices of $1,050,000, while the actual average was only $900,000.00 or **$150,000.00** less than the reported average, or approximately 14.3% lower than the TLC-posted average.

197.    Similarly, in January 2014, the TLC reported the average sale price for an individual medallion was $1,050,000. In fact, the true average was actually $977,000, or **$73,000.00** less than the reported average. Thus, the actual average was actually 7% lower than the TLC-posted average.

198.    At the time that the TLC made these statements to the public, the TLC knew that these prices were false and misleading. Specifically, the TLC had in its possession records showing that the prices it reported to the public were inflated compared to the actual sales prices.

199.    Defendant Yassky, who was the TLC Commissioner at the time these reports were published, knew that the TLC's statements regarding the average monthly sales prices for medallions were false and misleading. As noted above, on October 4, 2013, Allan Fromberg, the Deputy commissioner for Public Affairs of the Commission, admitted that "the TLC long ago made a *conscious decision* to set aside any transactions below 'fair market value', which I believe we define as within 10% of the high." (emphasis supplied).

200.    In other words, the TLC willfully and deliberately omitted all transactions that fell below "10% of the high" in its monthly sales data reports. As a result, the TLC's average monthly sales prices were, by definition, false and misleading.

**B.      TLC's False and Misleading Statements Regarding the Stability of Medallion Prices.**

201.    The TLC also misrepresented the trend in medallion prices. For example, it reported that the average transfer price was $1,050,000.00 million in July 2013 and that it stayed at that level until February 2014. In fact, the TLC knew that the average (artificially inflated) price was actually $1,015,000.00 million in July 2013 and had fallen to $982,000.00 by February 2014.

202.    For corporate medallions, the TLC reported that the average sales price was $1,320,000.00 million in May 2013 and that it stayed at that level until November 2013. In fact, according to the TLC's current reporting, there were *no* corporate medallion transfers for value between June 2013 and October 2013. In November, there was just one transfer, and that was at $1.2 million, or $120,000,00 lower than the reported average.

203.    In short, the TLC reports and statements to the public indicated stable medallion prices in the months leading up to the 2013/2014 auctions. However, in reality, individual medallion prices had already begun to fall. For corporate medallions, there were *no sales* upon which an average could be calculated.

**C.      TLC's False and Misleading Sales Pamphlets.**

204.    Apart from the false claims made in its average monthly sales reports, prior to the 2014 auction, the TLC issued a pamphlet that affirmatively stated that an investment in a medallion was "**better than the stock market**."

205.    Under that statement, the pamphlet shows a graph of purported medallion prices from January 2001 to 2014. The graph, which depicts a steep rise during 2013, shows the price of an independent medallion **<u>increasing by 500%</u>**, from $200,000.00 to more than $1,000,000.00 in early 2014. (Ex. F, Medallion Values Graph).

39

206.     The above statements, like similar statements made by the TLC over the years, were widely reported in the news media and in the financial press.  For example, in November 2013, on the eve of the first of the 2013/2014 auctions, The Wall Street Journal, citing alleged "data" from the TLC, reported that the value of a NYC taxi medallion "Outpace[d] Gold and the Dow Jones Industrial Average."

207.     The article quoted Defendant David Yassky, who was then the TLC Chairman, saying that "*Taxi cab ownership is highly profitable and that's why investors are willing to pay these prices.*"

208.     At the time Defendant Yassky made these statements, he knew that they were false and materially misleading.  Yassky had access to internal information from the OMB as to the *true* values of medallions at the time, and their likely values in the future. The internal information from OMB *directly contradicted* Yassky public statements regarding the high values of medallions.

209.     Defendant Yassky made these false statements purposefully and with an intent to deceive prospective medallion owners, as well as existing medallion owners.  Yassky deliberately wanted to continue the myth -- which TLC had carefully cultivated over the previous ten years -- that medallions were "highly profitable" investment and would continue to skyrocket in value in the future.

210.     In making these false statements, Defendant Yassky willfully and deliberately hid the truth about the warnings contained in the Roth Report, as well as the actual numbers contained in the OMB reports.

211.     Defendant Yassky intentionally made these false statements in order to induce prospective medallion purchasers to pay exorbitant prices for the right to own medallions, so as to continue to artificially drive up their value at auctions and on the secondary market, which in turn

would continue to generate tens of millions of dollars for the City.

212.     In making these false statements, Defendant Yassky willfully and deliberately omitted the truth about the TLC's average monthly sales data reports -- which TLC and City were eventually forced to admit -- that TLC reports of average medallion sales prices were routinely inaccurate, inflated, and outright false.

**D.     The TLC's False and Misleading Statements in its Taxicab Factbook.**

213.     In January 2014, the TLC published the 2014 Taxicab Factbook (the "Factbook"), a document that purported to state facts about the taxi industry and the TLC. In fact, the Factbook materially misstated the *actual* values of medallions during the relative time period, and omitted the role that TLC itself played in artificially increasing the price increases that are reported as "facts."

214.     For example, the Factbook stated as follows:

> The average annual price of independent medallions **increased 260% between 2004 and 2012** while the average annual price of mini-fleet medallions increased 321% over the same time period. When accounting for inflation, prices still increased 214% for independent medallions and 265% for mini-fleet medallions. The annualized **return on investment (ROI) for a medallion over this time would be about 19.5%.** In comparison, over the same time, the ROI for a similar investment in the S&P 500 would yield a 3.9% annual return.

215.     These claims were materially false and misleading.  In fact, the enormous increase in medallion values over this time period was not due, as the Factbook falsely suggest, to natural market forces. Rather, it was due to Defendants' artificial "upset prices," their knowing acquiescence to collusion and their fraudulent concealment of the Roth Report.

216.     The Factbook also falsely suggested that one of the central reasons for the marked increase in medallion prices during the relevant time period was the increase in cab fares:

> Medallion prices have increased during periods of medallion sales in part

41

due to the fare increases that have accompanied them. During these periods of sales, independent medallion prices rose 22% in 2004 and 22% in 2005.  Mini-fleet medallion prices rose 22% in 2004 and 21% in 2005.  In 2006, independent medallion prices rose 14% while mini-fleet medallion prices rose 27%. Medallion prices rose in 2007 as well by approximately 11% for independent and 19% for mini-fleet.

217.    In fact, fare increases had *nothing* to do with the increase in medallion values.  During this time period, the average income from driving a cab did not go up at all. Thus, the meteoric rise in medallion values was not the result of "fare increases," as TLC falsely suggested.

218.    In making the above false statements, and in deliberately concealing from medallion owners and prospective medallion owners the truth about the imminent decline of medallion values - - due to the plan to allow app-based FHVs to enter the New York City market without restrictions, as well as the fact that medallion prices had already "outstripped" their values by 2010 (Ex. D, Roth Report, at 2), the TLC intended to induce,  and did in fact induce, Plaintiffs and other Class members to: i) bid higher prices than they otherwise would have bid for the purchase of medallions at the 2013 and 2014 auctions; ii) purchase medallions on the open market at a grossly inflated price during this time period; iii) pay a transfer tax at a level significantly higher (5% of the inflated sales price)  than they otherwise would have had to pay;  iv) hold onto, rather than sell, their medallions, based on the astronomic (but artificial) increase in the values of medallions; and v) refinance their loans based on the (non-existent) "equity" that they had purportedly built up in their medallions.

## IV.    TLC'S FALSE CLAIMS ARE DIRECTLY CONTRADICTED BY OMB's DATA.

219.    At the same time that Defendants were making the above false statements about medallion values, they *knew* that the statements were false and misleading.

220.     Defendants' knowledge is confirmed by information contained in the Taxi Market Economic Study prepared by the City's Office of Management and Budget (the "OMB Report" or "Report"), which *directly contradicts* information contained in the TLC 2014 Taxicab Factbook published in January 2014, and an accompanying pamphlet, both of which were used to solicit medallion purchasers at the auctions.

221.     Significantly, as demonstrated by the OMB Report, which analyzed information known to the TLC and the City *prior* to the publication of the above reports, all known industry trends actually pointed *downward*. Indeed, projections through 2018 were "bearish" regardless of applying hypothetical (and overly optimistic) outside economic variables like double digit increases in employment rates in the City.

222.     In fact, the OMB Report stated that the value of independent medallions would **fall between 11.8% and 15.2%,** and the value of corporate medallions would fall between 6.4% and 3.9% by the end of 2018. This decline in medallion values was predicted to occur despite the City enjoying robust growth in employment and hotel room reservations.

223.     Thus, at the same time that Defendant Yassky was stating publicly that "Taxi cab ownership is highly profitable and that's why investors are willing to pay these prices," the truth was that in fact, medallion prices were expected to fall between 11.8% and 15.2% and that the overall medallion market was bearish.

224.     Thus, the information known to the City and the TLC at the time was directly at odds with the "bullish" impression that Defendants wanted to make on the potential bidders at the 2014 auction.

**V.       IN FURTHERANCE OF DEFENDANTS' FRAUDULENT SCHEME, TLC AND THE CITY LAUNCH A FALSE AND MISLEADING ADVERTISING**

**CAMPAIGN ON TV, RADIO AND IN THE NEWSPAPERS.**

225.    Apart from creating inflated "upset prices" (minimum prices) for medallions, allowing collusion and publishing false and misleading claims regarding medallion values, Defendants also launched an advertising campaign that was inherently deceptive and misleading.

226.    As Attorney General Letitia James later stated, when announcing her intent to sue the City of New York and TLC, Defendants improperly "*lured purchasers* by claiming the high value of taxi medallions could be used as collateral for a loan, to pay for a home or college education or to fund one's retirement." (Ex. B, Attorney General Statement).

227.    Specifically, starting in 2004 and continuing throughout the Class Period, the City and TLC continuously promoted ownership of medallions as a "solid investment with steady growth," claiming that its "return" was "better than the stock market" and in fact, had "outperformed every other type of investment that exists." (Ex. A, Attorney General's Notice of claim.)

228.    The origin of Defendants' false advertising campaign may be traced back to 2003.  At that time, TLC developed a comprehensive business, outreach and marketing plan. In its 2003 Annual Report, which Defendant Daus helped create, TLC stated that it would be "targeting both industry insiders, including businesses that already own taxing the cab medallions, as well as newcomers to the industry rather looking for new career opportunities or solid investment."

229.    In its 2004 Annual Report, TLC described how it had actually implemented this marketing plan. Specifically, "[t]o promote the upcoming medallion sale" in 2004, the TLC had "launched an advertising campaign consisting of two (2) print ads," as well as "professionally produced television and radio spots."

230.    The print portion of the campaign consisted of one (1) advertisement to promote

44

TLC's series of medallion sales seminars in each of the five (5) boroughs, and another follow-up advertisement that emphasized the positive aspects of medallion ownership.

231.    Each advertisement had a two-week run in twenty-five (25) major daily, weekly and ethnic publications, including the New York Post, the Staten Island Advance and the three major Spanish daily newspapers.

232.    The television portion of the campaign appeared on New York 1, Fox News, CNBC, MSNBC and MSG, as well as three of the five borough cable access channels. These ads were seen by viewers throughout the tri-state area.

233.    On radio, TLC's commercial ran on 1010 WINS and WQXR. These ads were heard by listeners throughout the tri-state area.

234.    To further stimulate and sustain interest in the bid package submission, TLC also distributed "reminder" flyers at various locations citywide, and made phone calls to those who had previously expressed interest reminding them of the upcoming opportunity.

**A.    TLC Makes Similar False and Misleading Claims in its Newsletter "TLC Times."**

235.    Apart from the TLC's ads on TV, radio and in newspapers, TLC also used its own publication, the "TLC Times," to further promote the benefits of owning a medallion.

236.    Specifically, the winter 2004 edition of the TLC Times was entitled the "Special Medallion Sale Issue." The main article on the first page, entitled "TLC Medallion Auction Offers Unique Opportunity to 'Drive Your Future,'" included the following promotional statement:

> New York City taxi cab medallions have a long history as a solid investment with steady growth period taxi medallions also provide both a reliable and consistent income and guaranteed employment. In addition, medallion is collateral that can assist in home financing come college tuition, or even "worry-free"

45

retirement.

(Ex. I, "TLC Times" Winter 2004).  See also Ex. J, Report of the Medallion Task Force ("Task Force Report"), January 2020,  at 32).

237.    The TLC also launched a companion website on www.nyc.gov/tax dedicated exclusively to the 2004 Medallion sales.

238.    In the winter of 2004, Plaintiff saw an article in the TLC newsletter, "TLC Times," written by Defendant Matthew W. Daus. Defendant Michael Bloomberg's name also appeared on the first page of the newsletter.

239.    The newsletter was entitled a "SPECIAL MEDALLION SALES ISSUE." (Ex.  I). The front-page article contained the following heading: "TLC Medallion Auction Offers Unique Opportunity to "*Drive Your Future*." (original emphasis).  An artistic rendering of a yellow taxi whizzing past an illuminated City Hall appeared to the right of the article, with the same message central message appearing: "Drive Your Future," and below the image, "Buy a New York City Taxi Medallion."  (Ex. I).

240.    In the article, Daus made several claims that were materially false and misleading.

241.    For example, Daus claimed that "New York City taxicab medallions have a long history as a solid investment with *steady growth*." (Id.) (emphasis supplied). In fact, as Daus well *knew* when he made this statement, medallion values had sharply declined as recently as just three years earlier.

242.    Specifically, from 1998 to the spring of 2001, taxi medallion values had markedly decreased in value, dropping from $229,000.00 in 1998 to $188,958,00 in 2001 for individual medallions, or a **$40,000.00** drop in value, representing an **18% decline** in value in just 3 years.

243.    During this same time period, the value of corporate medallions had dropped even further, from $277,318.00 to $209,458.00 in 2001, or **$67,860.00** drop in value, representing a **25% decline** in value.  The precipitous drop in medallion values from 1998 to 2001 directly contradicted Daus's claims regarding the "steady growth" in medallion values.

244.    There were several other false and misleading claims that Daus made in the TLC newsletter. For example, Daus claimed that "a medallion is collateral that can assist in home financing, college tuition, or even *worry-free retirement*." (Id.) (emphasis supplied).

245.     Daus made these same false claims at several outreach seminars in each of the five boroughs in March 2004, and again made these false claims when he spoke to Plaintiff Alec Soybel.

246.    In fact, Daus continued to make similar false claims throughout the Class Period.  TLC also continued to make similar false and misleading claims in its ads throughout the Class Period.

### B.    Multiple TLC Staff Members Complain About the False and Misleading Nature of TLC's Ad Campaigns.

247.    There were numerous internal complaints made by TLC staffers regarding the false claims in its advertising campaign.

248.    According to a New York Times article, dated May 19, 2019, "some former staffers said in interviews that they believed *the ad campaign inappropriately inflated prices* by implying medallions would make buyers rich, no matter the cost. Seven said they complained." https://www.nytimes.com/2019/05/19/nyregion/taxi-medallions.html, last viewed on March 16, 2021 (emphasis supplied).

249.    As a result of these multiple complaints, TLC was eventually forced to add a disclaimer to the claims in its advertisements, acknowledging that past performance did not guarantee

future results.

250.    However, even after such disclaimers were added, TLC *continued* to post false and misleading claims regarding medallion values on its website. For example, according to the New York Times, TLC "posted information on its website that said that medallion prices were, on average, *13 percent higher* they really were, according to a Times data analysis." (Id.) (emphasis supplied).

251.    The TLC's false and misleading ad campaign paid off right away.  In fact, almost *2000 prospective buyers* throughout the tri-state area contacted TLC by email telephone or in person, and expressed an interest in purchasing a medallion.

### C.    Defendants' Fraudulent Scheme and False Advertising Result in a Meteoric Rise in Medallion Prices from 2004 to 2014.

252.    All of Defendants' fraudulent actions, as well as their deceptive ad campaign, were geared toward one goal: "the holy grail of medallion values and the money it made for the City," (Ex. C, Torres Tr., at 2).  Defendants were highly successful in this goal, as confirmed by the astronomic rise in medallion prices from 2004 to 2014.

253.    As a direct result of Defendants' fraudulent scheme, the April 2004 auctions resulted in record prices, with medallion bid prices reaching **$360,000** for a single independent medallion and **$815,103.00** for a package of two corporate medallions ($407,551.00 each). As defendant Daus boasted to the crowd gathered at the auction, "*that is a record, folks*."

254.    Indeed, the 2004 price for two corporate medallions was the highest price ever paid for a pair of corporate medallions. By comparison, only one month earlier, a pair of corporate medallions was going for only $560,000.00 on the open market.   Thus, the price had gone up $255,103.00 over in a single month.

255.    The artificially inflated prices continued on the secondary market and in subsequent

48

TLC auctions.  For example, at the auction held in June 2006, independent medallions sold at a high of **$425,102.00**, while a package of corporate medallions reached **$1,108,295.00** ($554,148 each).

256.    At the May 2008 auction, independent medallions sold for **$524,000.00** each, and a package of two corporate medallions sold for as much as **$1,312,000.00** ($656,000.00 each).

257.    Medallion sales prices continued to rise astronomically in the same manner each and every year throughout the Class Period. They first exceeded $1,000,000 in 2011, which was far in excess of their true market value at that time.

258.    The 2014 auctions resulted in record sales prices, yet again, for both independent and corporate medallions. For its February 2014 auction, the TLC set an all-time high independent medallion "upset price" of $650,000. At the auction, the highest price paid for an independent medallion was $965,000 dollars, with an average price of $863,742.

259.    In March 2014, the City's last medallion auction to date, the TLC set an "upset price" of **1.7 million dollars** for a lot of two wheelchair accessible corporate medallions ($850,000.00 dollars each). The ultimate high bid was $2,420,500.00 ($1,210,250 each), with an average price of $2,328,757 ($1,164,378 each).

260.    The proceeds from medallion auctions produced significant revenue for the City. Moreover, until 2017, the city collected at 5% transfer tax on the gross price of any medallion transfers in the private market.

261.    From 2004 to 2014, the City made more than **$855,000,000.00** by selling medallions and collecting these transfer taxes. (Ex. A, Attorney General Notice of Claim).

## VI.    THE ARTIFICIAL BUBBLE COLLAPSES AFTER 2014, AND MEDALLION PRICES PLUMMET.

262.    The warnings in the Roth Report proved prophetic. In March 2014, just 3 years after

49

the Roth Report – and in what would prove to be the final TLC auction to date -- the high winning bid for a lot of two wheelchair accessible corporate medallions was $2,420,500.00 ($1,240,250 each), with an average price of $2,328,757 ($1,164,378 each).

263.    By mid-2014, medallion market values started to fluctuate and the prices began to significantly decline.   In 2015, amid dropping prices, the City suspended plans for future mediation auctions.

264.    In March 2015, the TLC reported two transfers of individual medallions for $800,000 each and the transfer of four corporate medallions for $925,000.00 each.  In April 2015, there were no medallion transfers of any kind (except for estate and other transfers, which were not for consideration). In May 2015, there was one individual medallion transfer for $700,000.00 and no corporate transfers. In June 2015, the TLC reported only three medallion transfers, all of which were foreclosures.

265.    In March 2016, defendant Meera Joshi, former TLC Commissioner, testified before the City Council's Committee on Transportation that the medallion secondary market was essentially "frozen," with a lot less transactions occurring to previous years, and cited this as reason that the City had decided to postpone a planned auction of new medallions

266.    In the first three months of 2017, the TLC reported just three individual medallion sales for value. Of the three sales, one was a foreclosure sale and one was an estate sale. The only non-estate/non-foreclosure sale was in March and it was for $241,000.

267.    By November 2019, the average sale price for medallions had plummeted down to $164,518.00 with a median price of $200,000. Throughout 2019, prices hovered around $200,000. Notably, **66%** of the medallion transfers that took place in 2019 were due to foreclosures.

268.    In the first quarter 2021, medallion prices have fallen to an all-time low, worth now approximately **$50,000.00** on the open market.  However, even this number is illusory, since nearly all medallion purchases are financed.    Thus, even if a medallion could theoretically be sold on the market for $50,000.00, in fact, its *actual* value is essentially zero, since this money would merely reduce the amount of debt that medallion owners still owe on their loans. [3]

269.    Most medallion owners have fallen far behind on their monthly loan payments. This will only get worse with the passage of time.  A large number of loan defaults and foreclosures are inevitable. The resulting liquidation of medallions will drive taxicab medallion prices even lower, toward zero. As a result, the secondary market for taxicab medallions, which the TLC portrayed as robust and rising before the 2014 auctions, has now completely collapsed.

### A.    Defendant Joshi Admits That There Was an "Artificial Bubble" for Medallion Prices.

270.    According to the Report of the Taxi Medallion Task Force, dated January 2020, "some have concluded that the decline in medallion values was caused, at least in part, by the bursting of a *speculative bubble*." (Ex. J, Task Force Report, at 14) (emphasis supplied).[4]

271.    Indeed, defendant Meera Joshi herself has used the term "artificial bubble" to describe the inflation of medallion values.

272.    At a speech to New York Law School on February 20, 2015, Joshi acknowledged that "[t]here is broad recognition that an *artificial bubble in medallion values existed* [that was] caused by a few transactions at record-high prices, transactions which were not actually representative of the

---

[3]  As of January 2020, medallion owners faced an average debt of approximately $700,000.00.

[4]  The Taxi Medallion Task Force (the "Task Force") was formed pursuant to Local Law 212 of 2018, and was charged with the responsibility of determining the reasons why the medallion market had collapsed.

asset's value."

273.    As Ms. Joshi further acknowledged at a deposition on March 1, 2019: "I know that I've used the term bubble. When I've used the term bubble, I have referenced a time when prices are artificially inflated." (Joshi Dep.  at 194).  See also id. at 195 ("I have talked about medallion prices generally.  I have talked about artificial inflation of medallion prices.  I have used the word bubble.").[5]

### B.    TLC Was Directly Responsible for Creating the "Artificial Bubble."

274.    Despite these admissions, Defendant Joshi has attempted to minimize TLC's responsibility for artificially inflating medallion values. Specifically, Ms. Joshi has claimed, falsely, that the artificial bubble was due to just a few outlier transactions at "record high-prices."  However, as detailed above, the artificial bubble in taxicab medallion prices was created and orchestrated by the TLC itself.

275.    Indeed, throughout the Class Period, the TLC was solely responsible for determining the fair market value of the medallion for purposes of the transfer taxes paid by medallion purchasers.

276.    Moreover, during the Class Period, the TLC was specifically charged with setting the minimum "upset price" at auctions in accordance with TLC rules, which state that "[t]he Chairperson will set a minimum upset price for Medallions to be sold." (35 R.C.N.Y. § 65-05(b)(1) (2015)).

277.    Further, during the Class Period, TLC was the agency that reviewed and approved the transfer of all medallions from one owner or entity to another, whether that was by auction or on the secondary market.  This review consisted of receipt of several documents including information about the person by a medallion, or if it is a corporate entity, the officers, shareholder or partners or members.

---

[5]Joshi gave this testimony in the matter of Singh v. City of New York, Index No. 701402/2017.

278.    Further, during the Class Period, the TLC also licensed and regulated brokers who assisted medallion owners and prospective purchasers in medallion sales.

279.    In light of the TLC's extensive involvement in setting medallion prices and setting medallion transfers, as set forth above, there can be no doubt that TLC, and by extension, the City of New York, played a critical role in the crash of the medallion market.

**C.    Multiple Government Officials and Agencies Have Recognized TLC's the Role in Causing the Collapse of the Medallion Market.**

280.    The TLC's role in causing the medallion market to collapse has been acknowledged by multiple government officials and agencies.

281.    For example, according to the Report of the Taxi Medallion Task Force, dated January 2020, "the City played a *substantial role* in the medallion market." (Ex. J, Task Force Report, at 33) (emphasis supplied).

282.    Indeed, "[w]hile the City does not set medallion values directly, the TLC monitors and reports trading prices, approves transfers between private parties, and runs the process by which new medallions enter the market – the auction." (Id. at 33).  See also id. at 35 ("the City played a *substantial role* in multiple aspects of the medallion market including by setting upset prices at the medallion auctions and marketing medallions.").

283.    As City Council Member Mark Levine stated on June 21, 2019: "The City itself also bears responsibility for this, because we were selling medallions with the goal of bringing revenue to the City and were promoting them and *pumping them up* in ways that I think mask[ed] the true risk that drivers were taking on."

284.    According to David Klahr, who from 2007 to 2016 held several management posts at TLC, the City allowed the artificial inflation of medallion prices to continue for one reason: "*Nobody*

*wanted to kill the golden goose.*"

285.   As former Councilman, and now Congressman, Ritchie Torres stated:

> The medallion market collapse is a cautionary tale of what happens when both government and markets are governed not by laws, but by *greed.* Just like there were brokers, lenders, and speculators all too eager to kill the gold goose for short-term profits, *the City of New York was all too eager to kill a once golden asset for short term revenues.* When it comes to the medallion market, *money was indeed the root of all evil.*

(Ex. C, Torres Tr, at 3) (emphasis supplied).

286. Thus, "the collapse of the medallion market, properly understood, should be remembered as *one of the greatest government scandals in the history of New York City.* (Id. at 1) (emphasis supplied).

287.  According to Attorney General James, the City and TLC "fraudulently inflated the price of thousands of yellow taxi cab medallions and profited from it over a 14-year period." (Ex. B, Attorney General Statement ). These Defendants "not only engaged in scheme that defrauded medallion owners, but continued to further market these medallions at overvalued rates even after internal reports raised warnings about the inflated values." (Id.).

288.   According to Gary Roth, "New York City government play[ed] a factor in keeping the [medallion] price high, as a 5% transfer fee is retained by the City on every transfer." (Roth Report, Ex. D, at 3).  Specifically, "if a seller want[ed] to sell a medallion at below the average of the last month's price, permission first need[ed] to be requested by the Department of Finance. *This [gave] the impression that medallion prices only go in one direction, up.* Last month's average price becomes the floor price the following month." (Id. at 3) (emphasis supplied).

289.   As Attorney General James stated, in language which aptly describes Plaintiffs'

reasons for filing this lawsuit:

> Government should be a source of justice, *not a vehicle for fraudulent practices*. These taxi medallions were marketed as a pathway to the American Dream, but instead, became a trapdoor of despair for medallion owners harmed by the TLC's unlawful practices. *The very government that was supposed to ensure fair practices in the market place engaged in a scheme that defrauded hundreds of medallion owners*, leaving many with no choice but to work day and night to pay off their overpriced medallions. What's worse is that the TLC knew their actions were affecting some of the city's most financially exposed immigrant families. We are taking action to ensure New York's hard-working taxi drivers can be made whole again and are repaid the *hundreds of millions the city unlawfully pocketed.*

Ex. B (Attorney General Statement ) (emphasis supplied).

290.    In sum, despite its claims to the contrary, TLC played an instrumental role in causing the "artificial bubble" that led to the collapse of medallion values. From setting "upset prices" and setting the fair market value of medallions of transfer taxes, to permitting collusion and overstating the value of medallions in multiple published reports, the TLC was directly involved in Defendants' scheme to artificially inflate medallion prices.

291.    Attorney General James has recently announced that her office will not, in fact, be commencing litigation against the City of New York and TLC.[6] Accordingly, Plaintiffs and the Class have no recourse but to seek justice on their own through the filing this action. Plaintiffs seek to recover damages in this action for all financial losses incurred as a result of Defendants' misrepresentations, manipulations and omissions concerning the value of medallions.

## VII.    CLASS ACTION ALLEGATIONS

292.    Plaintiffs bring this action as a class action pursuant to Rules 23(a)(b)(1) and (b)(3) of

---

[6] https://wwww.nydailynews.com, "N.Y. Attorney General Leticia James Backs Off Lawsuit Against NYC For Taxi Medallion Crisis," February 18, 2021, last viewed on March 20, 2021.

the Federal Rules of Civil Procedure on behalf of all similarly situated medallion owners between 2004 and 2017. Plaintiffs and Class Members bring this action seeking compensatory damages, treble damages, punitive damages against the individually named defendants, attorney's fees, costs, and any further relief this Court deems just and proper.

293.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") in their representative capacity on behalf of themselves and the Class of all persons similarly situated ("the Class"), defined as follows: All medallion owners, including the Plaintiffs in this action, who decided to buy, sell, hold or take out a loan against New York City taxicab medallions based on the artificially inflated market value for such medallions during the period between 2004 and 2017 ("Class Period"), and who suffered financial losses as a result.

294.    To the extent that the Court deems necessary, the Class may be further defined by the following subclasses: (i) all medallion owners who have been forced to put their medallions into "storage" as a result of the collapse of the medallion market (approximately 9,000 class members); ii) all medallion owners who have been forced into bankruptcy as a result of the collapse of the medallion market (approximately 950 class members); iii) all medallion owners who have defaulted on loans that used medallions as collateral, and whose medallions have been foreclosed upon and/or forfeited as a result (approximately 1004 class members for the years 2018 and 2019 alone).

295.    This action meets the following prerequisites of Rule 23(a) by which Plaintiffs may bring this action on behalf of the Class:

296.    **Numerosity**. Although the exact number of Class Members is presently unknown, Plaintiffs believe and allege that the Class will number over 9,000 medallion owners who have been forced to put their medallions into storage, including roughly 6,000 medallions that are owned

independently by so-called owner-drivers. Further, there at least 950 medallion owners who have been forced into bankruptcy as a result of the collapse of the medallion market, and at least 1004 medallion owners whose medallions have been foreclosed upon and/or forfeited due to the collapse of the medallion market. Without question, the members of the Class are so numerous that joinder of all members is impracticable.

297.    **Commonality**. There are significant legal and factual questions that are common to the Class. Such common questions include, but are not limited to, the following:

i)      Whether Defendants artificially and deliberately inflated the fair market value of medallions;

ii)     Whether Defendants misrepresented and/or omitted material information regarding the actual market prices for medallions;

iii)    Whether Defendants fraudulently concealed the truth about the decline of the value of medallions;

iv)     Whether Defendants made materially false and misleading representations regarding the value of medallions;

v)      Whether Defendants engaged in a scheme to improperly and unlawfully inflate the values of medallions;

vi)     Whether Defendants engaged in mail and wire fraud;

vii)    Whether Defendants engaged in a pattern of racketeering activity;

viii)   Whether the Freidman Defendants violated the Sherman Act by submitting identical and grossly inflated bids at TLC medallion auctions; and

ix)     Whether the TLC and City of New York Defendants knowingly permitted in this

collusive activity so as to artificially inflate the price of medallion markets at auctions and on the secondary market.

298.    **Typicality**. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are ordinary medallion owners who, along with all Class members, have been injured by the same wrongful acts and practices of Defendants as alleged herein.

299.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are antagonistic to, or in conflict, with the interests of the Class as a whole, and Plaintiffs have engaged counsel that is competent and experienced in federal class action and federal civil rights litigation.

300.    Jon L. Norinsberg, PLLC is a law firm with an office in New York City with almost thirty (30) years of civil litigation experience. Further, Mr. Norinsberg has extensive experience in civil litigation against state and local governments, and also has substantial experience in class action lawsuits, as recognized by several courts. See, e.g., Stinson v. City of New York, 282 F.R.D. 360 (S.D.N.Y. 2012) (noting that Jon L. Norinsberg is "competent and experienced in federal class action and federal civil rights litigation."); Marshall v. City of New York, et al., 10-Civ-2714 (JBW) (VVP) (E.D.N.Y. 2012) ("Mr. Norinsberg has been practicing for over twenty years and has an extensive background in litigating complex civil rights and constitutional law cases.").

301.    Cohen & Fitch LLP is a law firm with offices in New York City with extensive experience in civil rights litigation and class action lawsuits against municipal entities. Further, Cohen & Fitch LLP is also experienced in police, prosecutorial and court practices in the criminal courts throughout New York City given the fact that the partners of Cohen & Fitch LLP are both former prosecutors. Collectively, the two firms have litigated thousands of civil claims against the City of

New York and have an intimate knowledge of the complex federal litigation and class action litigation.

302.    **Superiority**. A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations. Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

303.    **Maintainability**. This action is properly maintainable as a class action for the prior independent reasons and under the following portions of Rule 23:

(a)    Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

(b)    Defendants have acted or refused to act on grounds generally applicable to the Class as a whole; and

(c)    Individual actions would unnecessarily burden the courts and waste judicial resources.

304.    **Predominance**. Questions of law and fact common to members of the Class predominate over any questions affecting only individual members. Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class Members.

305.    This action is superior to any other method for the fair and efficient adjudication of

this legal dispute, as joinder of all members is not only impracticable, but impossible given the large number of medallion owners who have suffered severe financial losses as a result of defendants' misconduct.  There will be no extraordinary difficulty in the management of the Class action.

## VIII.    PLAINTIFF'S FACTUAL ALLEGATIONS

### A.    The Factual Allegations of Plaintiff Alec Soybel

306.    Plaintiff ALEC SOYBEL first read about the medallion auction scheduled for April 2004 in the New York Times and other local newspapers.

307.    Plaintiff ALEC SOYBEL also watched TV advertisements about the taxi medallion auctions in 2004.

308.    After viewing such commercials, Plaintiff ALEC SOYBEL attended a TLC information session in Manhattan with a TLC representative, Defendant MATTHEW DAUS, before bidding in an actual TLC medallion auction in April 2004.

309.    During this information session, Defendant DAUS told Plaintiff ALEC SOYBEL, as well as other prospective medallion buyers who were present, that purchasing a taxi medallion would be a "once-in-a-lifetime opportunity" to become middle-class Americans and enjoy a "worry-free retirement." Daus further stated that purchasing a medallion was "what the American dream is all about."

310.    Plaintiff ALEC SOYBEL distinctly remembers DAUS state to Plaintiff, and others, that they would "not regret" buying Taxi medallions because TLC is responsible for the financial stability of taxi medallions, and TLC would *always* act in the best interests of medallion owners to protect their investment.

311.    In addition, Defendant DAUS said that taxi medallions were as "good as gold" and

60

would support Plaintiff and others in retirement, because the TLC has a "monopoly" over cab services in New York.

312.     Defendant DAUS assured Plaintiff and others that the City of New York would "100%" protect their investment in buying taxi medallions, and that they had nothing to worry about if they were to purchase a medallion.

313.     After that information session, Plaintiff believed that the TLC and City offered him a once-in-lifetime opportunity to become a middle class American, which had been Plaintiff's dream since he first came to the United States.

314.     Plaintiff trusted DAUS and the New York City Government, as did many other Class members who came to this session.

315.     Following this information session with DAUS, Plaintiff started preparing all documents to take part in the medallion auction in April 2004.

316.     Plaintiff was one of the bidders in the April 2004 auction, and his name was on the official auction list of the April 2004 auction as one of the bidders. However, Plaintiff did not win a bid to buy a taxi medallion at that time.

317.     Thereafter, approximately two weeks following the April 2004 medallion auction, Plaintiff learned that there was an opportunity to buy a taxi medallion through a taxi agent, Defendant Evgeny A. Freidman, who told him that the price for purchasing a taxi medallion had increased because of the sales prices at the April 2004 TLC auction.

318.     Freidman then offered to sell Plaintiff a "mini-fleet" medallion, or two medallions, for a price of $650,000.00, which Plaintiff agreed to pay.

319.     In addition to this purchase fee, Plaintiff was *also* required to pay $32,500.00 to New

York City as 5% transfer tax fee, along with other miscellaneous out-of-pocket costs, including but not limited to: i) $5,000.00 to Freidman for acting as his taxi agent;  ii) $800.00 to the Metran Credit Union's attorney for processing him documents; iii) $500.00 to  Freidman's office for creating a medallion corporation on his medallions; and iv) an additional $1,200.00 for various other documents.

320.    In total, Plaintiff paid an amount of **$690,000.00** for the mini-fleet medallions to Metran credit union, which included a $150,000.00 down payment, which Plaintiff had borrowed from several friends, and another $540,000.00 that Plaintiff received from a taxi loan with the Metran Credit Union.

321.    At the present time, Plaintiff still owns the two mini-fleet medallions, but he was recently forced to put them into "storage" due to the collapse of medallion values.

322.    There are many other medallion owners who, like Mr. Soybel, have been forced to place their medallions into storage. In total, there are approximately 9,000 medallions (out of a total of 13,605 medallions licenses that were issued by the City of New York) that have been now been placed into storage.

323.    Once the medallion is placed into storage, it has literally *zero* value.  It cannot be used in any manner to generate income for its owner.

324.    At present, Mr. Soybel still owes a large amount of money to the bank for his (now worthless) medallion.  Specifically, Plaintiff owes $378,520.92 to PenFed Credit Union, or **70%** of the loan that he took out in 2004 to finance the purchase of his medallions.

325.    With his medallion now in storage, and not generating *any* income, Plaintiff has no possible means to pay off this staggering amount of debt.

326.     In other words, just as TLC policy analyst Gary Roth had warned back in 2010, the

price of the medallions that Mr. Soybel purchased has far "outstripped their values," and as a result, Plaintiff is now "'underwater,' meaning the value of [his] outstanding loan is greater than the current selling price." (Ex. D, Roth Report, at 2, 4).

327.    Plaintiff had no idea about Defendants' fraudulent manipulation of the medallion market, and their artificial inflation of medallion prices until June 2019, when he read about the City Council Oversight and Investigations Committee hearing.  Plaintiff was truly shocked when he learned, for the first time, about Defendants' fraudulent scheme to artificially inflate medallion values.

328.    Until June 2019, Plaintiff had no idea that, in fact, the marked increase in medallion prices from 2004 to 2014 was *actually* due to collusive bidding, manipulation of average monthly sales data, the use of inflated "upset prices" to set an artificial floor on medallion values, false and misleading advertising claims and the deliberate concealment of the Roth Report.

329.    Had Plaintiff known the truth about the artificially inflated medallion prices, he never would have bought his medallions in the first place in 2004. Instead, Plaintiff is now saddled with a suffocating debt that he has no way of ever paying off.

330.    Plaintiff likewise had no idea about the existence of the Roth Report, and only first learned about the Roth Report in June 2019, when Councilman Torres made public mention of the Report, which was then repeated in stories in the local press and social media.

331.    Had Plaintiff known the truth about the declining values of his medallions, as documented in the Roth report, he would have sold his medallions back in 2010, and would have completely discharged his outstanding debt.

332.    Plaintiff also had no idea about TLC's plan, as conceived by Defendants Daus and Yassky on September 25, 2012, to allow app-based FHVs, such as Uber and Lyft, to enter the New

York City market without the need to purchase a medallion from TLC.

333.    Had Plaintiff known the truth about this plan, which would destroy the value of his medallions, he would have sold his medallions as soon as he learned of this  material information, and would have completely discharged his outstanding medallion debt.

**B.    The Factual Allegations of Plaintiff  Galina Kaminker**

334.    Plaintiff GALINA KAMINKER and her sister, Mendlana Myshalov, first purchased a mini-fleet of medallions in May 1992 for a total of $280,000.00, with each medallion costing $140,000.00

335.    In order to purchase the medallions, Plaintiff Kaminker and her sister both took out loans with Progressive Credit Union.

336.    As medallion values increased over time, both Plaintiff and her sister periodically refinanced their loans, using their medallions as collateral.[7]

337.    Medallion values reached their peak value of approximately $1.25 million in 2014. At that time, Plaintiff Kaminker gave serious consideration to selling her medallion.  However, Plaintiff decided *not* to sell her medallion, because she was convinced -- based on reading TLC's false claims in its ads, in its publications, and on its websites -- that owning a medallion was a "solid investment with steady growth," its "return" was "better than the stock market," that medallions had "outperformed every other type of investment that exists," and that medallion values had increased by **500%** from 2002 to 2014, from $200,000 to $1,000,000. (Ex. F, Medallion Values Graph).

338.    Plaintiff relied upon TLC's false representations in deciding to hold onto and retain,

---

[7]  Since most medallion loans required a "balloon" payment after just a few years, refinancing the loans in this manner was a common practice amongst medallion owners such as Plaintiffs.

rather than sell, her medallion.  As a result of such false claims, Plaintiff was convinced that a medallion was a highly valuable asset, and that owning such an asset would lead to "worry-free retirement," as defendant Daus and the TLC ads had falsely proclaimed.

339.    At the time that Plaintiff made her decision to retain her medallion, she had no knowledge of the Roth Report, which had cast severe doubt on the future of the medallion market in 2010. Plaintiff did not know about the Roth Report because Defendants had fraudulently concealed the existence of this report.

340.    Plaintiff first learned about the existence of the Roth Report in June 2019, when she attended the City Council Oversight and Investigations Committee hearing on the collapse of the medallion market. On the first day of this hearing, Ms. Kaminker heard Councilman Torres state that "[t]he Roth Report was written in 2010 and it confirms that *TLC and City hall knew everything*." (Ex. C, Torres Tr., at 3). Prior to that time, Ms. Kaminker never heard about the Roth Report and had no knowledge about its existence.

341.    Had Plaintiff known the truth about the declining value of medallions -- as the Roth Report confirmed in late 2010 -- she would have sold her medallion back in 2010, which would have allowed her to fully liquidate her outstanding loan balance, and avoid the substantial economic losses that she is now suffering from.

342.    Had other similarly situated Plaintiffs and Class members known the truth about the declining value of medallions -- as the Roth Report confirmed in late 2010 – they would have, as reasonably prudent medallion owners and investors, sold their medallions back in 2010, which would have allowed them to fully liquidate their outstanding loan balances, and avoid the substantial economic losses that they have now incurred.

343.    Plaintiff also had no idea about TLC's plan, as conceived by Defendants Daus and Yassky on September 25, 2012, to allow app-based FHVs, such as Uber and Lyft, to enter the New York City market without the need to purchase a medallion from TLC.

344.    Had Plaintiff known the truth about this plan, which would destroy the value of her medallion, she would have sold her medallion as soon as she learned of this  material information, and would have completely discharged her outstanding medallion debt.

345.    Had other similarly situated Plaintiffs and Class members known the truth about the plan to allow to allow e-hail FHVs, such as Uber and Lyft, to enter the New York City market without the need to purchase a medallion from TLC, they would have, as reasonably prudent medallion owners and investors, sold their medallions as soon as they learned of this material information, which would have allowed them to fully liquidate their outstanding loan balances, and avoid the substantial economic losses that they have now incurred.

346.    Until June 2019, Plaintiff also had no idea about Defendants' fraudulent manipulation of the medallion market, and their artificial inflation of medallion prices, when she heard the City Council Oversight and Investigations Committee publicly expose Defendants' misconduct for the first time.

347.    Prior to hearing about Defendants' fraudulent manipulation of the medallion market, Plaintiff believed that the sharp increase in medallion values from 2004 to 2014 was due to natural market forces since, as Defendants had repeatedly stated, medallions were an investment that was "better than the stock market."

348.    Until June 2019, Plaintiff had no idea that, in fact, the marked increase in medallion prices from 2004 to 2014 was *actually* due to collusive bidding, manipulation of average monthly

sales data, the use of inflated "upset prices" to set an artificial floor on medallion values, false and misleading advertising claims and the deliberate concealment of the Roth Report. Plaintiff was truly shocked to learn these things.

349.    Had Plaintiff known the truth about the artificially inflated medallion prices, she would have sold her medallion in 2010, and would have completely discharged all of her outstanding debt. Instead, Plaintiff is now saddled with a suffocating debt that has resulted in her complete financial ruin.

350.    Had other similarly situated Plaintiffs and Class members known the truth about the artificially inflated medallion prices, they would have, as reasonably prudent investors, likewise sold their medallions in 2010, and would have completely discharged all of their outstanding debts.

351.    After more than 28 years, Plaintiff still owns her medallion, but it has literally *zero* value.  It cannot be used in any manner to generate income for her.

352.    At present, Ms. Kaminker still owes a large amount of money to the bank for her (now worthless) medallion.  Specifically, Plaintiff owes $210,544.87 to PenFed Credit Union, at least according to their records. The current value of her medallion on the open market, however, is only $50,000.00.

353.    With her medallion now in *de facto* "storage"  -- not being used by herself, and not capable of being leased to any third party due to the collapse of the medallion market -- Plaintiff has no possible means to pay off this staggering amount of debt.

354.    Just as TLC policy analyst Gary Roth had warned back in 2010, Plaintiff is now "'underwater,' meaning the value of [her] outstanding loan is greater than the current selling price." (Ex.  D, Roth Report, at 4).

355. Similar to Ms. Kaminker, her sister, Mendlana Myshalov, has likewise been forced to place her medallion into *de facto* "storage," and has likewise defaulted on her medallion loan.

356. Since Plaintiff personally guaranteed her sister's loan -- both Plaintiff and Ms. Myshalov were *required* to personally guarantee each other's loans in order to purchase their medallions -- she now is *also* liable for the full amount of her sister's medallion loan, $292,044.75, at least according to the lender's records.

357. Based on the foregoing, Plaintiffs, and other similarly situated Class members, have a "holder" cause of action against the TLC and City, as Defendants' misrepresentations and omissions caused Plaintiffs to retain ownership of medallions that they had acquired prior to the wrongdoing, and would have otherwise sold but for Defendants misrepresentations and omissions.[8]

## IX.    PLAINTIFFS' RICO ALLEGATIONS

358. There were two separate RICO enterprises that were involved with creating, implementing and continuing the fraudulent scheme to artificially medallion prices, as set forth above. The first was the "TLC Enterprise," and the second was the "City Enterprise." Each Enterprise played in instrumental role in the racketeering activities alleged herein.

### A. The TLC Enterprise.

359. With respect to the TLC Enterprise, TLC is a "person" within the meaning of 18 U.S.C. §1961(3).[9]

---

[8]  See Anwar v. Fairfield Greewich, Ltd., 728 F. Supp. 2d 372, at 444-5 (S.D.N.Y. 2010) (discussing "holder" actions under New York law).

[9]  The Second Circuit has expressly held that governmental entities can be "enterprises" for purposes of a civil RICO claim. See DeFalco v. Bernas, 244 F.3d 286, 307-308 (2001)("[T]his Court has previously held that a governmental unit can be a RICO enterprise") (citing United States v. Angellilli, 660 F.3d 23, 30-35 (2d Cir. 1981), cert . denied, 455 U.S. 910, 945 (1982)

360.    The TLC Enterprise was responsible for creating, implementing and continuing the fraudulent scheme to artificially medallion prices throughout the Class Period.

361.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals, associated in fact, that Plaintiffs refer to as the "TLC enterprise": (i) former TLC Commissioner Matthew Daus; (iii) former TLC Commissioner David Yassky; (iv) former TLC Commissioner Meera Joshi;   (vi) Deputy Commissioner for Public Affairs of the TLC Allan Fromberg; (vii) Deputy Commissioner for Legal Affairs and General Counsel for the TLC Charles R. Fraser; (viii) Eugene Freidman;   (ix) Vladmir Basin; (x) Mamed Dzhaniyev; and  (xi) Michael Bloomberg.

362.    During the Class Period, the TLC Enterprise was an ongoing organization which engaged in, and whose activities affected, interstate commerce in the tri-state area. The members of the TLC Enterprise functioned as a unit as described above and shared the common purpose of maximizing their unlawful profits from the sale of artificially inflated medallions.

363.    While each of the above individuals was a member and part of the TLC Enterprise, each individual also had an existence separate and distinct from the enterprise.

**B.    The City Enterprise.**

364.    Apart from the TLC Enterprise, there was another enterprise responsible for creating, implementing and continuing the fraudulent scheme to artificially medallion prices: the "City Enterprise."

365.    With respect to the City Enterprise, Defendant City is a "person" within the meaning of 18 U.S.C. §1961(3).

366.    Based upon plaintiffs' current knowledge, the following persons constitute a group of

individuals associated in fact that plaintiffs refer to as the "City Enterprise": (i) former TLC Commissioner Matthew Daus; (iii) former TLC Commissioner David Yassky; (iv) former TLC Commissioner Meera Joshi; (vi) Deputy Commissioner for Public Affairs of the TLC Allan Fromberg; (vii) Deputy Commissioner for Legal Affairs and General Counsel for the TLC Charles R. Fraser; (viii) Eugene Freidman; (ix) Vladmir Basin; (x) Mamed Dzhaniyev; and (xi) Michael Bloomberg.

367.    During the Class Period, the City Enterprise was an ongoing organization which engaged in, and whose activities affected, interstate commerce. The members of the City Enterprise functioned as a continuing unit, as described above, and shared the common purpose of maximizing their unlawful profits from the sale of artificially inflated medallions.

368.    While each of the above individuals is a member and part of the City Enterprise, each individual also has an existence separate and distinct from the enterprise.

C.    **The Predicate Acts.**

i.    **The Predicate Acts for the TLC Enterprise.**

369.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud). As set forth above, throughout the Class Period, the TLC Enterprise and the City Enterprise engaged in conduct violating each of these laws to effectuate their fraudulent schemes.

370.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, members of the TLC Enterprise, as defined above, and in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter

and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, bid-forms, correspondence, and payments.

371.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, members of the TLC Enterprise, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things which include but are not limited to contracts, bid-forms, invoices, correspondence, and payments.

372.    The matter and things sent by TLC throughout the tri-state area via the Postal Service, commercial carrier, wire or other interstate electronic media include, inter alia:

(a)    Monthly sales average reports that falsely and fraudulently stated the average monthly sales prices for medallions in the preceding month;

(b)    Pre-auction price reports that falsely and fraudulently supported the average monthly sales prices for medallion transactions prior to TLC auctions;

(c)    Quarterly newsletters that contained false and fraudulent misrepresentations regarding medallion values;

(d)    TLC sales pamphlets containing false and fraudulent misrepresentations regarding medallion values;

(e)    TLC's monthly "Sales-Average Prices & Numbers of Transfers" reports that falsely and fraudulently supported the average monthly sales prices for medallion transactions;

(f)    TLC print advertisements containing false and fraudulent misrepresentations

71

regarding medallion values; and

(g)     TLC contracts for the sale and transfer of medallions;

(h)     TLC Bid Forms for placing bids for medallions at TLC auctions; and

(i)      TLC invoices for the purchase, sale, lease and/or transfer of medallions.

373.    Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by the TLC Enterprise included information or communications in furtherance of, or necessary to, effectuate the scheme.

374.    The TLC Enterprises' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and the class and obtaining substantial monetary revenues from the sale of artificially inflated medallions.

375.    The TLC Enterprise either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

376.    As a result, TLC has obtained money and property belonging to Plaintiffs and class members, and Plaintiffs and the class have been injured in their business or property by the defendants' overt acts of mail and wire fraud.

i.      **The Predicate Acts for the City Enterprise.**

377.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, members of the City Enterprise, as defined above, and in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the

Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, and payments.

378.   For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, members of the City Enterprise, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things which include but are not limited to contracts, invoices, correspondence, and payments.

379.   The matter and things sent by the City Enterprise throughout the tri-state area, via the Postal Service, commercial carrier, wire or other interstate electronic media include, inter alia:

(a)   Monthly sales average reports that falsely and fraudulently stated the average monthly sales prices for medallions in the preceding month;

(b)   Pre-auction price reports that falsely and fraudulently supported the average monthly sales prices for medallion transactions prior to TLC auctions;

(c)   Quarterly newsletters that contained false and fraudulent misrepresentations regarding medallion values;

(d)   TLC publications containing false and fraudulent misrepresentations regarding medallion values;

(e)   TLC print advertisements containing false and fraudulent misrepresentations regarding medallion values; and

(f)   TLC's monthly "Sales-Average Prices & Numbers of Transfers" reports that falsely and fraudulently supported the average monthly sales prices for medallion transactions.

(g)   TLC contracts for the sale and transfer of medallions;

73

(h)    TLC Bid Forms for placing bids for medallions at TLC auctions;

(i)    TLC invoices for the purchase, sale, lease and/or transfer of medallions.

380.    Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by the City Enterprise included information or communications in furtherance of or necessary to effectuate the scheme.

381.    The City Enterprises' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and the class and obtaining substantial monetary revenues from the sale of artificially inflated medallions.

382.    The City Enterprise either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

383.    As a result, City Enterprise has obtained money and property belonging to Plaintiffs and class members, and Plaintiffs and the Class have been injured in their business or property by the defendants' overt acts of mail and wire fraud.

**D.    The Pattern of Racketeering Activity.**

**i.    The Pattern of Racketeering Activity for the TLC Enterprise.**

384.    The TLC Enterprise engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing, or aiding and abetting in the commission of, at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, over a period of ten years thus constituting a "closed end" pattern of racketeering activity during this time period.

385.    Specifically, from at least 2004 up through 2014, the TLC Enterprise engaged in

multiple and repeated unlawful actions to artificially inflate the price of medallions. Thereafter, from 2014 until 2017, TLC continued to collect a 5% transfer tax on all medallion sales, thereby receiving substantial revenues from transactions on the secondary market long after the last auction was held in 2014.

386.    Further, beginning no later than 2004, and continuing at least through 2014, the TLC Enterprise falsely marketed "Taxicab Licenses," or medallions, to purchasers, prospective purchasers, brokers and financial institutions as investments and conducted auctions of medallions, in a manner that artificially inflated the price of medallions.

387.    Further, starting in April 2004, and continuing through June 2006, the TLC Enterprise knowingly and deliberately permitted collusive bidding in its medallion auctions, so as to artificially inflate the sales price for said medallions at those auctions and in future auctions, as well as on the secondary market for medallions.

388.    Further, starting in 2004 and continuing through 2014, the TLC Enterprise created a grossly inflated "upset price" for medallions which was far in excess of what the fair market value was for medallions at the time, and then publicly stated, falsely, that the "upset price" had been determined in collaboration with OMB and reflected the fair market values of medallions based on average sales prices over the prior 6 months, when in fact, the "upset prices" had not been based on any such data.

389.    Further, beginning on or about late December 2010, and continuing through June 24, 2019, the TLC Enterprise willfully and deliberately concealed a damaging internal report prepared by TLC policy analyst Gary Roth that determined, in part, that the price of medallions had "outstripped" their underlying values and that the inflated price of medallions could lead to medallion owners

defaulting on their loans and finding themselves "underwater." (Ex. D, Roth Report, at 2,4).

390. Further, beginning in September 2013, and continuing for every month until at least September 2014, the TLC Enterprise falsely overstated the monthly average price of medallion sales by fraudulently removing from these reports any medallion sales that fell outside the highest 10% of medallion sales for that month, and also made misleading statements regarding the number of sales of medallions for that month.

391. As set forth above, the TLC Enterprise has committed multiple acts of racketeering activity during the relevant time period. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including plaintiffs and class members.

392. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other and amounted to continued racketeering activity during the relevant time period, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

        **ii.**        **The Pattern of Racketeering Activity for the City Enterprise.**

393. The City Enterprise engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, over a period of ten years, thereby constituting a "closed end" pattern of racketeering activity during this time period.

394. Specifically, from at least 2004 up through 2014, the City Enterprise engaged in multiple and repeated unlawful actions to artificially inflate the price of medallions. Thereafter, from

2014 until 2017, TLC continued to collect a 5% transfer tax on all medallion sales, thereby receiving substantial revenues from transactions on the secondary market long after the last auction was held in 2014.

395.   Specifically, beginning no later than 2004, and continuing through 2014, the City Enterprise marketed "Taxicab Licenses," or medallions, to purchasers, prospective purchasers, brokers and financial institutions as investments and conducted auctions of medallions, in a manner that artificially inflated the price of medallions.

396.   Further, starting in April 2004, and continuing through June 2006, the City Enterprise knowingly and deliberately permitted collusive bidding in its medallion auctions, so as to artificially inflate the sales price for said medallions at those auctions and in future auctions, as well as on the secondary market for medallions.

397.   Further, starting in 2004 and continuing through 2014, the City Enterprise created a grossly inflated "upset price' for medallions which was far in excess of what the fair market value was for medallions at the time, and then publicly stated, falsely, that the "upset price" had been determined in conjunction with OMB and reflected the fair market values of medallions based on average sales prices over the prior 6 months, when in fact, the "upset prices" had not been based on any such data.

398.   Further, for a period of almost 9 years, beginning on or about late 2010, and continuing through June 24, 2019, the City Enterprise fraudulently concealed a damaging internal report prepared by TLC policy analyst Gary Roth that determined, in part, that the price of medallions had outstripped their underlying values and that the inflated price of medallions could lead to medallion owners defaulting on their loans and finding themselves "underwater." (Ex. D, Roth

77

Report at 2, 4).

399.    Further, beginning in September 2013, and continuing to at least September 2014, the City Enterprise falsely overstated the monthly average price of medallion sales by fraudulently removing from these reports any medallion sales that fell outside the highest 10% of medallion sales for that month, and also made misleading statements regarding the number of sales of medallions for that month.

400.    As set forth above, the City Enterprise has committed multiple acts of racketeering activity during the relevant time period. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including plaintiffs and class members.

401.    The multiple acts of racketeering activity which Defendant committed and/or conspired to or aided and abetted in the commission of, were related to each other and amounted to continued racketeering activity during the relevant time period, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**E.    The "Horizontal" and "Vertical" Relatedness of the RICO Activities.**

402.    All of the aforesaid activities were related, both "horizontally" and "vertically," to the fraudulent scheme and the RICO enterprises identified above.

403.    Specifically, all of the predicate crimes identified above were related to each other, in that each and every act was performed as part of, and in furtherance of, Defendants' fraudulent scheme to artificially inflate the values of medallions.

404.    In particular, the following predicate acts all were conducted in furtherance of Defendants' unlawful goal of artificially inflating medallion values: i) setting an artificial, and grossly

inflated, "upset" price as for medallions; ii) permitting collusion to take place at auctions to artificially inflate the values of medallions; iii) publishing materially false and misleading "Sales-Average Prices & Numbers of Transfers" reports to artificially inflate the values of medallions; iv) launching a false and misleading advertising campaign -- on radio, TV, the Internet and in newspapers -- to lure prospective medallion owners, and further inflate the value of medallions, by falsely claiming that such an investment was "better than the stock market" and would lead to a "worry-free retirement"; and v) fraudulently concealing an internal report, the Roth Report, which warned that medallions were already overvalued as of 2010, and if publicly disclosed, would have thwarted Defendants continuing efforts to inflate medallion values.

405.    All of the above predicate acts were taken in furtherance of Defendants' singular, overriding purpose of artificially inflating medallions.    As such, the requirement of "horizontal relatedness" is satisfied.

406.    The requirement of "vertical relatedness" is satisfied as well. The foregoing predicate were not only related to one another, but also, they were related to the enterprise as a whole.

407.    The Defendants in the TLC Enterprise were enabled to commit the predicate acts identified above because all such acts were related to the activities of the TLC Enterprise. Specifically, these predicate acts were all done for the purpose of inflating the value of medallions and maximizing TLC's profit.

408.    The Defendants in the City Enterprise were likewise enabled to commit the predicate acts identified above because all such acts were related to the activities of the City Enterprise. Specifically, these predicate acts were all done for the purpose of inflating the value of medallions and maximizing the City's profit.

**F.    The Role of Each Individually Named Defendant in the RICO scheme.**

409.    Each individually named defendant directly participated in, and significantly contributed to, the predicate acts that took place during the relevant time period.  The specific wrongful acts of each defendant is detailed below.[10]

**i.    The Wrongful Acts of Defendants Bloomberg and Daus.**

410.    Defendants Bloomberg and Daus were the chief architects behind Defendants' fraudulent scheme to artificially inflate medallion values. The scheme was initially conceived as a "quick fix" to the plug the hole in the substantial budget deficit that existed in 2003.

411.    As the New York Times noted in its investigation, Bloomberg "was eager for revenue. He had a 3.8 billion hole in his budget."  Thus, Bloomberg and Daus decided to sell medallions with the method that they thought would bring in the most revenue: a series of limited auctions that required participants to submit sealed bids above ever-increasing minimums.

412.    Blinded by "the holy grail of medallion values and the money it made for the City," (Ex. C, Torres Tr., at 2), Bloomberg and Daus used fraudulent means to attain their objectives. Specifically, immediately prior to the 2004 auctions, Bloomberg and Daus created an artificially inflated "upset price," or minimal sales price, for auction transactions, knowing that such "upset" price was far in excess of the fair market value of medallions at that time.

413.    Despite their public statements to the contrary, the "upset price" was *not* tethered to any established market value for medallions, was *not* based on actual sales data from the previous six months, and was *not* consistent with fair market values for medallions at that time.  Rather, the upset price was determined by Bloomberg, who was in charge of the Mayor's Office of Management and

---

[10] In addition to the allegations contained in this section, all factual allegations previously set forth against these individually named defendants are incorporated by reference herein.

Budget, and who, working in concert with Defendant Daus, who was in charge of the TLC, both of whom knowingly set the upset price at an artificially high level.

414.    As detailed above, the 2004 auction was highly successful and yielded record sales prices for medallions, generating substantial revenues for the City of New York and TLC.

415.    Having seen first-hand how medallions could be used to plug budget deficits and avoid politically costly decisions, Bloomberg decided to repeatedly hold medallion auctions throughout his three terms as mayor. In fact, from 2004 to 2013 (the last year of Bloomberg's term), the City and TLC held an unprecedented **14 medallion auctions** during this time period.

416.    Bloomberg took these actions to maximize the profits to Defendant City of New York, which earned over $855 million dollars from medallion sales, based on direct revenues and 5% transfer taxes on each transaction on the open market, during the Class Period.

417.    Bloomberg's strategy of using medallion sales to plug holes in the budget is further confirmed by statements that he made in 2012, when he proposed a budget that included a projected 1 billion dollars from the sale of 2,000 new yellow taxi medallions: "If we don't get the $1 billion, we're going to have to cut services in the City dramatically, there's no other alternative." (https://www.politoc.com/states/new-york/albany/story/2012/05/bloomberg-presents-a-balanced-budget-with-movingparts, last viewed on March 17, 2021).

418.    In furtherance of their scheme to artificially inflate medallion prices, starting in 2004 and continuing throughout the Class Period, Bloomberg and Daus, as well as his successors the TLC, Defendants Yassky and Joshi, continuously promoted ownership of tax medallions as a "solid investment with steady growth," claiming that its "return" was "better than the stock market," that could lead to "worry-free retirement," when they knew that these statements were materially false

81

and misleading.

419.     As Attorney General Letitia James later stated, when announcing her intent to sue the City of New York and TLC, Defendants improperly "*lured purchasers* by claiming the high value of taxi medallions could be used as collateral for a loan, to pay for a home or college education or to fund one's retirement." (Ex. B, Attorney General Statement ).

420.     Indeed, the TLC's ad campaign, combined with its false and misleading sales data, amounted to a "misinformation campaign" that "led to highly inflated pricing." (Id.) As a result, taxi medallions that were "marketed as a pathway to the American Dream," in fact became "a trapdoor of despair for medallion owners harmed by the TLC's unlawful practices." (Id.)

421.     Both Bloomberg and Daus were directly involved in creating this false and misleading campaign prior to the first auction in April 2004.  Bloomberg personally appeared in the print ads -- which showed him behind the wheel of a yellow cab (Ex.  G) – as did Daus, who personally appeared in several TLC advertisements, news articles and promotional materials. (E.g., Ex. I).

422.     The advertising campaign was so misleading that, according to the New York Times, "some former staffers said in interviews that they believed *the ad campaign inappropriately inflated prices* by implying medallions would make buyers rich, no matter the cost. Seven said they complained." https://www.nytimes.com/2019/05/19/nyregion/taxi-mediallions.html, last viewed on March 16, 2021 (emphasis supplied).

423.     Defendants Bloomberg and Daus were directly responsible for creating this false and misleading ad campaign, which induced Plaintiffs to purchase medallions at artificially inflated prices.

424.     Both Bloomberg and Daus had access to internal information about medallion Values

-- maintained by the OMB and TLC -- that directly contradicted the claims that they were making in the TLC ads, but nonetheless, they allowed these false and misleading ads campaign to be broadcast to induce prospective medallion owners to buy taxicab licenses at artificially inflated prices.

425.    Further, Daus made materially false statements -- as set forth above and incorporated by reference herein -- in his direct communications with Plaintiff and other similarly situated Class members, as well as in his statements contained in the TLC Times Winter 2004 edition. Daus' false statements induced Plaintiff, and other similarly situated Class members, to purchase medallions in reliance on such false claims.

426.    Further, Daus fraudulently concealed the plan that he and Defendant Yassky had devised on September 25, 2012 -- as set forth above and incorporated by reference herein -- to allow app-based FHVs such as Uber and Lyft, to enter the New York City market without the need to purchase a medallion.

### ii.    The Wrongful Acts of the Freidman Defendants and Charles Fraser.

427.    As set forth above, Defendants Evgeny Freidman, Vladimir Basin and Mamed Dzhaniyev engaged in fraudulent and collusive bidding at multiple auctions held in April 2004, and June 2006.

428.    Defendant Fraser was not only aware of this unlawful activity, but was knowingly complicit in allowing such collusion and price-rigging to occur, despite the objections of the New York City Law Department and the Office of Management and Budget.

429.    In fact, Fraser specifically acknowledged that the identical bids by the Freidman Defendants "*appeared to be a scam*." Notwithstanding this acknowledgment -- and despite the fact that the Official Bid Forms expressly prohibit *any* type of collusion -- Fraser insisted "there was

nothing improper or illegal in terms of the TLC rules and regulations."

430. Fraser's refusal to take corrective action and set aside these collusive bids amounts to a ratification by TLC of this fraudulent and unlawful scheme. As AG James put it, the City and TLC "accepted bids that were unambiguously the result of collusive bidding, adopted a position that permitted collusive bidding, misled participants in its auctions into believe collusion was impermissible, and failed to take necessary action to prevent collusive bidding going forward." (Ex. A, Attorney General Notice of Claim).

431. Indeed, consumed with a desire to make as much money as possible for TLC, Fraser, acting on behalf of TLC and the City, knowingly participated in this price-rigging scheme by turning a blind-eye to the Freidman Defendants' collusion at the 2004 and 2006 auctions. Instead, Fraser used these artificially inflated collusion prices to establish the value medallions in all future TLC auctions and secondary market transactions.

### iv.   The Wrongful Acts of Defendant Fromberg.

432. Allan Fromberg, Deputy commissioner for Public Affairs of the Commission, aided and abetted the TLC Commissioners and the City of New York in the creation of, implementation and/or continuation of the fraudulent scheme during the Class Period.

433. Specifically, Defendant Fromberg was instrumental in TLC's publication of false and misleading medallion prices on at least 10 (ten) occasions between November 2013 and September 2014. These monthly reports, known as "Sales-Average Prices & Numbers of Transfers" reports, documented third-party medallion sales, each of which was subject to the City's exclusive oversight and approval.

434. According to an October 4, 2013 email from Fromberg, TLC made a "conscious

decision" to omit any reference to medallion sales which were lower than the top 10% of medallion sales for that particular month. Thus, TLC deliberately manipulated medallion sales data by removing all medallion sales which fell below an arbitrary – and completely unwarranted – benchmark. As a result, in each and every report issued by TLC between November 13 and September 2014, TLC materially overstated actual average of medallion transfers.

435.    Defendant Fromberg also played an instrumental role in creating the materially false and misleading "facts" that were published in the TLC Factbook in January 2014. For example, the Factbook states that the "annualized return on investment (ROI) for a medallion over this time [2004-2012] would be about **19.5%.** In comparison, over the same time, the ROI for a similar investment in the S&P 500 would yield a 3.9% annual return." However, this enormous "19.5%" return on investment was, in fact, based on upon the City and TLC's own fraudulent manipulation of the medallion prices, as detailed above.

436.    Fromberg published these "facts" knowing that they were materially false and misleading, and he did so with a deliberate intent to deceive prospective buyers of medallions. At the same time that Fromberg published these false facts, he knew that they were directly contradicted by the findings in the OMB Report.

437.    According to the OMB Report, which analyzed information known to the TLC and the City prior to and at the time of the auctions, all known industry trends actually pointed *downward*. Specifically, the OMB Report stated that the value of independent medallions would **fall between 11.8% and 15.2%,** and the value of corporate medallions would fall between 6.4% and 3.9% by the end of 2018.

438.    Fromberg deliberately concealed these findings by OMB, and instead, painted a false

85

and misleading picture about the exceptionally high "ROI" that medallion purchasers could expect in the future.

439.    In engaging in such deceptive conduct, Defendant Fromberg aided and abetted the City and TLC carrying out their unlawful scheme to artificially inflate medallion values, leading to the catastrophic collapse of the medallion market in New York.

**iii.    The Wrongful Acts of Defendants Yassky.**

440.    Defendant Yassky, who was the TLC Commissioner from 2010 to 2014, knowingly aided and abetted the City of New York in the implementation and continuation of the fraudulent scheme during the Class Period.

441.    Specifically, Defendant Yassky was instrumental in TLC's publication of false and misleading medallion prices on at least 10 (ten) occasions between November 2013 and September 2014.  These monthly reports, known as "Sales-Average Prices & Numbers of Transfers" reports, documented third-party transactions of Taxicab Licenses, each of which was subject to the City's exclusive oversight and approval.

442.    While Yassky was TLC commissioner, TLC made a "conscious decision" to omit any reference to medallion sales which were lower than the top 10% of medallion sales for that particular month.

443.    With Yassky's knowledge and consent, TLC deliberately manipulated medallion sales data by removing all medallion sales which fell below an arbitrary -- and completely unwarranted – price level.  As a result, in each and every report issued by TLC between November 13 and September 2014, TLC materially overstated actual average of medallion transfers.

444.     Defendant Yassky also played an instrumental role in creating the materially false and

misleading "facts" that were published in the TLC Factbook in January 2014. For example, the Factbook states that the "annualized return on investment (ROI) for a medallion over this time [2004-2012] would be about **19.5%.** In comparison, over the same time, the ROI for a similar investment in the S&P 500 would yield a 3.9% annual return." However, this enormous "19.5%" return on investment was, in fact, based on upon the City and TLC's own fraudulent manipulation of the medallion prices, as detailed above.

445.    Apart from the above false and misleading statements, Defendant Yassky also fraudulently concealed the truth about the downward trend in medallion values. At the same time that Defendant Yassky was stating publicly that "Taxi cab ownership is highly profitable and that's why investors are willing to pay these prices," Yassky *knew* that OMB had stated that medallion prices were expected to fall between 11.8% and 15.2% and the overall medallion market was "bearish."

446.    Defendant Yassky also fraudulently concealed the findings of the Roth Report. The Roth report was written in late 2010, after Yassky had become the TLC Commissioner.

447.    As the TLC Commissioner, Yassky knew about the Roth Report, and he also knew that Roth had warned that the price of medallions had already "outstripped their values" by 2010, and that if medallion prices were to drop significantly in the future, "it could force recent medallion buyers 'underwater,' meaning the value of their outstanding loan is greater than the current selling price." (Ex. D, Roth Report, at 2, 4).

448.    Yassky knew that the release of this information to the public would severely damage medallion values and would preclude the City and TLC from continuing to artificially inflate medallion prices at auctions and on the secondary market in the future.

449.    Thus, Yassky made a conscious decision to conceal the Roth Report from prospective

medallion buyers and the public at large. Yassky did so knowingly and intentionally, for the deliberate purpose of continuing to artificially inflate the values of medallions at auctions and on the secondary market.

450. Further, Yassky fraudulently concealed the plan that he and Defendant Daus had devised on September 25, 2012 -- as set forth above and incorporated by reference herein -- to allow app-based FHVs such as Uber and Lyft, to enter the New York City market without the need to purchase a medallion.

451. In acting in this manner, Defendant Yassky aided and abetted the City and TLC carrying out their unlawful scheme to artificially inflate medallion values, leading to the catastrophic collapse of the medallion market.

### iv. The Wrongful Acts of Defendant Joshi.

452. Similar to Defendant Yassky, Defendant Meera Joshi likewise made a conscious decision to conceal the Roth Report from prospective medallion purchasers and the public at large. Defendant Joshi was the TLC Commissioner from 2014 to 2019.

453. As the TLC Commissioner, Joshi was well aware of the Roth Report and the warnings contained therein about the inflated values of medallions and the potential collapse of the medallion market. However, Joshi realized, like Defendant Yassky, that the release of this information to the public would be extremely damaging to the City and TLC, and would preclude Defendants from continuing to artificially inflate the values of medallions at auctions and on the secondary market. Thus, Defendant Joshi made a conscious decision to conceal the Roth Report and keep Roth's conclusions hidden from prospective medallion purchasers and the public at large.

454. In deliberately concealing the Roth Report in this manner, Defendant Johsi knowingly

concealed the "artificial bubble" of medallion values that existed during her tenure as the TLC Commissioner.

455.    As Joshi later publicly acknowledged, "[t]here is broad recognition that an artificial bubble in medallion values existed" and that the purchase prices for medallions "were not actually representative of the asset's value." Nonetheless, Joshi helped preserve this "artificial bubble" -- long after it became clear that medallion prices were markedly inflated and completely unsustainable -- by concealing the Roth Report from prospective medallion purchasers and the public at large.

456.    Joshi knew that the release of this information to the public would severely damage medallion values and would preclude the City and TLC from continuing to artificially inflate medallion prices at auctions and on the secondary market in the future.

457.    Defendant Joshi also fraudulently concealed the truth about the downward trend in medallion values. Just like Defendant Yassky, Joshi, as the TLC Commissioner, *knew* that OMB had stated that medallion prices were expected to fall between 11.8% and 15.2% and the overall medallion market was "bearish." Nonetheless, Joshi made a conscious decision to hide this information from prospective medallion buyers and the public at large, so as to preserve the "artificial bubble" for as long as possible.

458.    By engaging in such unlawful conduct, Defendant Yoshi aided and abetted the City and TLC carrying out their unlawful scheme to artificially inflate medallion values, leading to the catastrophic collapse of the medallion market.

## X.  FIRST CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962(c)) (Civil RICO Claim)

459.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

89

460.    This claim for relief arises under 18 U.S.C. §1962(c).

461.    As set forth above, Defendants have violated 18 U.S.C. §1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the TLC Enterprise through a pattern of racketeering.

462.    As set forth above, Defendants have violated 18 U.S.C. §1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the City Enterprise through a pattern of racketeering.

463.    As a direct and proximate result, Plaintiffs and the Class members have been injured in their business or property by the predicate acts which make up the defendant's patterns of racketeering activity through the TLC Enterprise.

464.    As a direct and proximate result of Defendants' racketeering activities, Plaintiffs and the Class members have been injured in their business or property by the predicate acts which make up the defendant's patterns of racketeering activity through the City Enterprise.

465.    Specifically, Plaintiffs and Class members have been injured in their business or property by having paid too much for the purchase of medallions from Defendant City of New York. These out-of-pocket losses can readily be determined by comparing the amount of money that Plaintiffs and Class members paid for their medallions, on the one hand, with the amount of money the medallions were *actually* worth at the time, had their prices not been artificially inflated by Defendants.

466.    Plaintiffs have further been injured in their business or property in that, as a direct and proximate result of Defendants' fraudulent scheme, the market value of medallions has collapsed, and Plaintiffs have been forced to place their medallions into storage.

467.    Since the current value of their Plaintiffs' medallions is zero, Plaintiffs are entitled to recover all out-of-pocket losses that they have sustained in connection with their purchase, financing and/or retention of their medallions.

> **A. Plaintiffs' RICO Claims Are Timely, Since Plaintiffs Did Not Have "Inquiry Notice" of Defendants' Fraudulent Scheme Until June 24, 2019.**

468.    Plaintiffs' RICO claims are timely, since Plaintiffs and the Class did not have "inquiry notice" of such claims until June 24, 2019, when they first learned of Defendants' fraudulent scheme.

469.    As set forth above, Defendants fraudulently and deliberately concealed their wrongdoing in order to prevent Plaintiffs from learning about Defendants' misconduct.

470.    It was not until the City Council Oversight and Investigations Committee conducted its hearing on June 24, 2019 that Plaintiffs learned for the first time -- by attending the hearings in person and/or reading accounts of the hearing in the press and on social media -- about the Roth Report and the fraudulent manipulation by TLC and the City of medallion prices.

471.    Plaintiffs had no way of knowing about any of this misconduct prior to the City Council's Hearing in June 2019.

472.    Thereafter, in February 2020, Plaintiffs learned for the first time -- based on the Notice of Claim filed by Attorney General Letitia James against the City of New York and the TLC -- about Defendants' other acts of misconduct, including but not limited to: i) setting up an artificial floor ("upset price") below which bids for medallions were never accepted; ii) permitting blatant acts of collusion to occur at medallion auctions; and iii) publishing false and misleading medallion prices on at least 10 occasions in 2013 and 2014.

473.    Plaintiffs had no way of knowing about any of this particular misconduct – i.e.,

collusion and false average monthly sales reports -- prior to the Notice of Claim filed by Attorney General Letitia James.

474.    Since Defendants concealed their wrongdoing and unlawful conduct, the statute of limitations relating to the claims for relief alleged herein was tolled, due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

475.    Neither Plaintiffs nor the Class knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports of government investigations concerning the artificial inflation and manipulation of medallion prices.

476.    Plaintiffs and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.

477.    On February 18, 2021, news stories broke informing the public that Ms. James' office would not, in fact, be pursuing any legal claims against the City and TLC.

478.    Since Ms. James will not be pursuing any legal claims against the City and TLC, Plaintiffs have decided that it is now incumbent upon them to file this action and seek redress against the Defendants' for their fraudulent scheme to manipulate the medallion market.

## XI. <u>SECOND CLAIM FOR RELIEF</u>
(Violation of 18 U.S.C. § 1962(d)) (RICO Conspiracy)

479.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

480.    All Defendants did agree and conspire to violate 18 U.S.C. § 1962(c) to conduct and participate in the affairs of the TLC Enterprise through a pattern of racketeering activity, in violation

of 18 U.S.C. § 1962(d).

481.    All Defendants did agree and conspire to violate 18 U.S.C. § 1962(c) to conduct and participate in the affairs of the City Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C.  18 U.S.C. § 1962(d).

482.    All Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described herein.

483.    Defendants' agreement may be inferred from circumstantial evidence, including but not limited to, the words, actions and interdependence of the activities and the persons involved in the conspiracy.

484.    As a direct and proximate result of this conspiracy, Plaintiffs and Class members have been injured in their business or property by having paid too much for the purchase of medallions from Defendant City of New York.

485.    Plaintiffs have further been injured in their business or property in that, as a direct and proximate result of Defendants' fraudulent scheme, the market value of medallions has collapsed, and Plaintiffs have been forced to place their medallions into storage.   Thus, the current value of their medallions is zero.

## XII. <u>THIRD CLAIM FOR RELIEF</u>
(Violation of 15 U.S.C. §1) (Agreement Restraining Trade)

486.    Plaintiffs hereby incorporate each preceding paragraph as though fully set forth herein.

487.    Defendants knowingly entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

488.   During the Class Period, Defendants knowingly entered into a series of collusive agreements to reduce open and fair bidding by fixing and/or manipulating medallion prices at TLC auctions, so as to artificially inflate the value of said medallions.

489.   In entering into this this conspiracy, Defendants exhibited a conscious commitment to a common scheme for the purpose of achieving an unlawful objective.

490.   The conspiracy to manipulate medallion prices caused injury to both Plaintiffs and the Class by depriving them of the benefit of accurate medallion prices reflecting true market conditions.

491.   The conspiracy to manipulate medallion prices caused injury to both Plaintiffs and the Class by forcing them to pay a greater price for medallions at auctions, and on the secondary market, than they otherwise would have paid absent Defendants' wrongful conduct.

492.   The conspiracy to manipulate medallion prices substantially affected interstate commerce in the tri-state area, and/or occurred within the flow of interstate commerce within the tri-state area.

493.   The conspiracy is *per se* a violation of Section 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the medallion market. There was no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct.

494.   As a direct result of Defendants' violation of Section 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property throughout the Class Period.

495.   Plaintiffs and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

**A.     Plaintiffs' Antitrust Claims Are Timely Based on Defendants' Fraudulent Concealment of Their Collusion and Price-Rigging Scheme.**

496.   Plaintiffs' antitrust claims are timely, since Plaintiffs and the Class did not have

94

"inquiry notice" of such claims until June 24, 2019, when they first learned of Defendants' fraudulent scheme.

497.    As set forth above, Defendants fraudulently concealed their wrongdoing in order to prevent Plaintiffs from learning about Defendants' misconduct.

498.    It was not until the City Council Oversight and Investigations Committee conducted its hearing on June 24, 2019 that Plaintiffs learned for the first time -- by attending the hearings in person and/or reading accounts of the hearing in the press and on social media -- about the Roth Report and the fraudulent manipulation by TLC and the City of medallion prices.

499.    Plaintiffs had no way of knowing about any of this misconduct prior to the City Council's hearing in June 2019.

500.    Thereafter, in February 2020, Plaintiffs learned for the first time -- based on the Notice of Claim filed by Attorney General Letitia James against the City of New York and the TLC -- about Defendants' other acts of misconduct, including but not limited to:  i) setting up an artificial floor ("upset price") below which bids for medallions were never accepted; ii) permitting blatant acts of collusion to occur at medallion auctions; and iii) publishing false and misleading medallion prices on at least 10 occasions in 2013 and 2014. (Ex. A, Attorney General Notice of Claim).

501.    Plaintiffs had no way of knowing about any of this particular misconduct – i.e., collusion -- prior to the Notice of Claim filed by Attorney General Letitia James.

502.    Since Defendants concealed their wrongdoing and unlawful conduct, the statute of limitations relating to the claims for relief alleged herein was tolled, due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

95

503.   Neither Plaintiffs nor the Class knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports of government investigations concerning the artificial inflation and manipulation of medallion prices.

504.   Plaintiffs and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.

505.   On February 18, 2021, news stories broke informing the public that Ms. James' office would not, in fact, be pursuing any legal claims against the City and TLC.

506.   Since Attorney General James will not be pursuing any legal claims against the City and TLC, Plaintiffs have decided that it is now incumbent upon them to file this action and seek redress against Defendants for their fraudulent scheme to manipulate the medallion market.

### XIII. FOURTH CLAIM FOR RELIEF
(Unjust Enrichment under New York State Law)

507.   Plaintiffs hereby incorporate each preceding paragraphs as though fully set forth herein.

508.   As a direct result of Defendants' fraudulent scheme, Plaintiffs and other similarly situated Class members were induced to purchase medallions from Defendants at inflated prices, both at TLC auctions and on the secondary market.

509.   Defendants TLC and the City of New York were unjustly enriched as a result of said transactions.

510.   Specifically, TLC and the City of New York earned approximately $855 million dollars from medallion sales, based on direct revenues from medallion sales and the 5% transfer taxes for each transaction on the secondary market, during the Class Period.

511.    The above monetary enrichment that Defendants obtained was at the expense of Plaintiffs and other similarly situated Class members.

512.    Allowing Defendants to retain the monetary benefits obtained from artificially inflated medallion prices would be unjust. Therefore, both equity and good conscience require Defendants to make full restitution to Plaintiffs and other similarly situated Class members.

513.    Considerations of justice and good conscience preclude allowing Defendants to retain any fees paid to them from Plaintiffs and any Class members.

## XIV. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment in their favor and in favor of the Class against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), that Plaintiffs be designated as Class representatives, and that Plaintiffs' Counsel be appointed as Class counsel for the Class;

B.    Declaring that Defendants have violated Section 1962(c) of the RICO statute;

C.    Awarding compensatory damages and full restitution of all funds acquired from Defendants' unlawful and fraudulent scheme, including disgorgement of profits and actual damages suffered by Plaintiffs and Class members, in the amount of $855,000,000;

D.    Ordering Defendants to pay treble damages under 18 U.S.C. § 1962, in the amount of $2,565,000,000 dollars in total damages;

E.    Declaring that Defendants have violated Section I of the Sherman Act;

F.    Ordering Defendants to pay treble damages for their violations of Section I of the

Sherman Act.

G.      Awarding punitive damages against the individually named defendants, to be awarded

to Plaintiffs and each Class member;

H.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable

attorneys' fees and the reimbursement of expenses in amounts to be determined by the

Court;

I.       Awarding prejudgment interest; and

J.       Granting such other and further relief as this Court deems to be just and proper.

## XV. DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand

a trial by jury of all issues in this matter.

Dated:  New York, New York
        April 6, 2021

                                        Yours, etc.,

                                        **JON L. NORINSBERG, ESQ., PLLC**


                              By:    _____
                                       JON L. NORINSBERG, ESQ.
                                       *Attorneys for Plaintiffs*
                                       110 E. 59th Street, Suite 3200
                                       New York, New York 10022
                                       Tel. No.: (212) 791-5396
                                       Fax No.: (212) 406-6890

98

**COHEN & FITCH, LLP**

By:             /s/

              JOSHUA P. FITCH, ESQ.
              *Attorneys for Plaintiffs*
              110 E. 59th Street, Suite 3200
              New York, New York 10022
              Tel. No.: (212) 374-9115
              Fax No.: (212) 406-6890